🅐 Neutral
As of: December 3, 2015 4:28 PM EST

## *McClendon v. Ill. DOT*

United States District Court for the Northern District of Illinois, Eastern Division

July 31, 2015, Decided; July 31, 2015, Filed

No. 12 C 2021

**Reporter**
2015 U.S. Dist. LEXIS 101343

CHARLES McCLENDON, Plaintiff, v. ILLINOIS DEPARTMENT OF TRANSPORTATION, CARMEN W. IACULLO, and JAMES A. STUMPNER, Defendants.

**Prior History:** *McClendon v. Ill. DOT, 2012 U.S. Dist. LEXIS 142866 (N.D. Ill., Oct. 3, 2012)*

## Core Terms

Yard, OEIG, grievance, fired, overtime hours, retaliated, Operations, employees, secondary, fraudulent, race discrimination, retaliation claim, termination, activities, unionize, teaching, investigators, protected activity, adverse action, pretext, days, reasonable jury, organizing, intake, circumstantial evidence, political affiliation, similarly situated, employment action, summary judgment, questionnaire

**Counsel:** [*1] For Charles McClendon, Plaintiff: Charles B. Leuin, LEAD ATTORNEY, Caitlin Annatoyn, Greenberg Traurig, LLP, Chicago, IL; Ian D Burkow, Kyle L Flynn, Greenberg Traurig, Chicago, IL.

For Illinois Department of Transportation, James Stumpner, Carmen Iacullo, Defendants: Andrew Laurence Dryjanski, LEAD ATTORNEY, Office of the Illinois Attorney General, Chicago, IL; Helena Lee Burton Wright, LEAD ATTORNEY, Office of the Attorney General, Chicago, IL; Allison Patricia Sues, Assistant Attorney General, Chicago, IL.

For Office of the Executive Inspector General, Deponent: Thor Yukinobu Inouye, LEAD ATTORNEY, Illinois Attorney General, Chicago, IL.

**Judges:** Elaine E. Bucklo, United States District Judge.

**Opinion by:** Elaine E. Bucklo

## Opinion

### MEMORANDUM OPINION AND ORDER

In September 2010, the Illinois Department of Transportation ("IDOT") fired Charles McClendon ("McClendon") from his job as a maintenance yard technician. McClendon thinks IDOT's stated reason for his termination--an inspector general's report concluding that he submitted fraudulent overtime hours--is a lie. He claims that IDOT actually fired him because of his race and in retaliation for his complaints about race discrimination, his affiliation with the Republican [*2] Party, and his union organizing activities.

IDOT and two of McClendon's former supervisors (collectively, "Defendants") have moved for summary judgment on his race discrimination and retaliation claims. For the reasons stated below, I grant Defendants' motion only with respect to Count V, McClendon's retaliation claim under the *First Amendment*.

### I. Background

At the summary judgment stage, I must view the evidence in the light most favorable to McClendon and draw all "justifiable inferences" in his favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

McClendon, who is African-American, began his employment with IDOT in 1997 as a seasonal motor truck driver. Two years later, IDOT hired him as a Highway Maintainer and then promoted him to Environmental Technician III. In 2000, after training as a Maintenance Cadre for one year, McClendon became an Environmental Technician V or "Yard Technician." As a Yard Technician, McClendon was responsible for managing one of IDOT's twenty-three maintenance yards in District 1, which covers the six counties in northeastern Illinois. McClendon managed IDOT's maintenance yard near Interstate 57 ("the I-57

Yard") on the south side of Chicago from 2000 until IDOT fired him in 2010.

McClendon's immediate supervisor [*3] after his promotion to Yard Technician was Defendant James Stumpner ("Stumpner"), the South Area Operations Manager. In 2002, Stumpner was promoted to Chief of IDOT's Maintenance Bureau in District 1. Stumpner, in turn, reported to Defendant Carmen Iacullo ("Iacullo"), who served as Acting Operations Manager over the Bureau of Maintenance and Assistant to IDOT's Regional Engineer for District 1 from 2004 until 2014.

## A. McClendon's political affiliation

Iacullo's arrival at IDOT coincided with the beginning of former Governor Rod Blagojevich's administration. Unlike the IDOT administrators who came into power during the Blagojevich administration, McClendon was a self-identified Republican who was active in national, state, and local politics.

McClendon has presented evidence that Stumpner and Iacullo were both aware of his political affiliation. In either 2000 or 2004, McClendon asked Stumpner for vacation time to attend former President George W. Bush's inauguration in Washington, D.C. McClendon Dep. at 71. When making this request, which Stumpner approved, McClendon disclosed his support for the Republican Party to Stumpner. *Id.*

McClendon also had conversations about his political affiliation [*4] with Iacullo. *Id.* at 70. One conversation occurred in approximately 2005 after IDOT employees Ray Frais and Jack Neven searched Stumpner's office for evidence of whether he was engaging in political activities on the job. *Id.* at 71-73; McClendon Declar. at ¶ 9. McClendon and his immediate supervisor at the time, Al Richardson, went to IDOT District 1 headquarters in Schaumberg to discuss the search. *Id.* When McClendon asked why his office had been searched, Iacullo denied knowing anything about it, but remarked that "we all have different affiliations." McClendon Dep. at 72.

McClendon then discussed the search with Neven, who explained that Iacullo and Stumpner had instructed him to investigate a complaint that McClendon was engaging in political campaigning on IDOT work time. *Id.* at 169-70. Neven identified himself as a Democrat, commented on McClendon's affiliation with the Republican Party, and indicated that he was going to have the FBI reconstruct materials seized from the shredder in McClendon's office.

*Id.* at 169-70, 186. If the materials showed that McClendon had been campaigning on the job, Neven threatened to have him fired. *Id.* at 169. McClendon denied Neven's accusations, which he characterized as "a bunch of crap." *Id.*

The final incident [*5] with political overtones occurred in February 2008 when Mike Schivarelli, the acting South Area Operations Manager, informed McClendon that a man named Eugene Davis ("Davis") would be reporting to the I-57 yard to assist with operations. Schivarelli identified Davis as someone who was "assisting" Iacullo. Stumpner testified that Iacullo instructed him to find work for Davis even though he was not employed in IDOT's Division of Highways. Stumpner Dep. at 242-45. Stumpner viewed Davis as one of several politically connected employees whom Iacullo instructed him to find a place for in the Bureau of Maintenance. *Id.*

McClendon told Iacullo, Stumpner, and Schivarelli that he did not need Davis's assistance at the I-57 yard. Schivarelli responded that Davis was going to "float to most of the south area yards" starting with McClendon's work site. Dkt. No. 95-2 at 86. On February 7, 2008, Davis reported to the I-57 yard and told McClendon that, per Iacullo's instructions, Davis was there to oversee operations and would not take directions from McClendon. McClendon Dep. at 51. After McClendon objected, Iacullo and Stumpner called the I-57 yard. *Id.* at 50-51. McClendon refused to train someone who was not [*6] in the Maintenance Cadre position and told Iacullo and Stumpner to find somewhere else for Davis. *Id.* at 51. Iacullo told Davis to report back District 1 headquarters and then reassigned him to the Bishop Ford yard. *Id.* at 51-52. After the Eugene Davis incident, Stumpner verbally reprimanded McClendon and reminded him that he (Stumpner) ran the yard. *Id.* at 52-53.

## B. McClendon's union organizing

On an unspecified date between 2005 and 2007, IDOT Secretary Tim Martin ("Secretary Martin") held an open forum meeting with all of the Yard Technicians in District 1. *Id.* at 36-38, 227. McClendon asked Secretary Martin during the open forum whether IDOT would address the disparity in pay between minority Yard Technicians and white employees in the same position who earned more. *Id.* McClendon thought IDOT had hired several Yard Technicians between 2003 and 2008 who received higher pay and greater opportunities for promotion than incumbent minority employees. *Id.* at 42-43. When McClendon raised this concern with his supervisors on several occasions before Secretary Martin's open forum, they promised to follow up with IDOT administrators in Springfield to see

what could be done. *Id.* at 41-42. Privately, Stumpner and two human resources officials--Charles Klemz and Giovanni [*7] Fulgenzi--warned McClendon that he was going to cause problems for himself by advocating for minority workers and advised him to speak only for himself. *Id.* at 44.

In a side conversation after the public forum, Secretary Martin told McClendon that salaries were subject to the collective bargaining process, so McClendon's only remedy was to unionize the Yard Technician position. When asked if he would oppose efforts to unionize the Yard Technicians, Secretary Martin said no. Iacullo gave the same response and mentioned that Stumpner and the Area Operations Managers were also trying to unionize. *Id.* at 183.

Between 2005 and 2007, after his conversation with Secretary Martin, McClendon started trying to unionize the Yard Technicians. His activities included getting union cards signed, attending meetings, and gathering information. *Id.* at 179. At some point during McClendon's union organizing activities, Stumpner summoned him for a meeting. Stumpner advised McClendon that someone had complained that McClendon was doing union business during the work day. *Id.* at 182-83. McClendon denied the accusation, which apparently ended the matter. *Id.* at 183.

In 2008 or 2009, Iacullo testified at a hearing in Springfield that Yard Technicians could not [*8] function as effective managers if they were unionized. Iacullo Dep. at 55, 57. McClendon was one of several Yard Technicians who attended the Springfield hearing. Stumpner saw McClendon at the hearing. Stumpner Dep. at 246. Iacullo does not recall seeing McClendon at the hearing and claims that he first learned about McClendon's union organizing activities when the present lawsuit was filed. Iacullo Dep. at 58-59. In contrast, McClendon claims that Iacullo saw him at the hearing. McClendon Declar. at ¶ 6.

McClendon's third and final attempt to unionize the Yard Technician position occurred in June 2010, three months before his termination, but he has not explained what efforts he made or whether Defendants were aware of them. *Id.* at ¶ 5.

## C. McClendon's grievances

In April 2007, McClendon filed the first in a series of grievances challenging various IDOT personnel actions. McClendon's first grievance argued that IDOT should have paid his overtime hours from earlier that year at a higher rate. *See* Dkt. No. 106-1 at 87-88. Stumpner and Iacullo denied McClendon's grievance on the day it was filed. *Id.*

About four months later, in a letter dated August 7, 2007, IDOT denied McClendon's grievance [*9] on the ground that it was untimely. *Id.* at 83.

In November 2007, McClendon filed a grievance challenging IDOT's decision to have Mike Schivarelli serve as the Area Operations Manager over two of the three areas in District 1 during the upcoming winter season instead of allowing a Yard Technician to supervise one of the areas on an acting basis. *See* Dkt. No. 95-2 at 123. McClendon had previously asked IDOT to provide Yard Technicians with the opportunity to gain "training experience" as Area Operations Managers and "permanent consideration for this position." *Id.* After McClendon discussed the matter with his immediate supervisor, Stumpner and Iacullo denied his grievance. *Id.* at 121-22. According to McClendon, Stumpner said that IDOT could do whatever it wanted to do with regard to the Area Operations Manager position and told McClendon to stay in his place. McClendon Dep. at 115, 117.

McClendon filed a third grievance on January 1, 2008, this time alleging that IDOT paid minority Yard Technicians in District 1 less than white employees holding the same position. *See* Dkt. No. 95-2 at 128. McClendon's grievance referenced a meeting three years earlier when he made the same complaint to IDOT's top brass in District [*10] 1: Diane O'Keefe, the Regional Engineer; Iacullo, Assistant to the Regional Engineer; Chuck Klemz, the Administrative Services Manager; Giovanni Fulgenzi, the Personnel Manager; and Stumpner, the Maintenance Bureau Chief. McClendon named George Harvey and Dionne Winesberry in his grievance as the other minority Yard Technicians who were being paid less than whites.

Stumpner denied McClendon's pay discrimination grievance on January 28, 2008. Dkt. No. 95-2 at 126. In a letter dated February 28, 2008, Iacullo advised McClendon that nine of the twenty-five Yard Technicians in District 1--including six white males, one black male not named in his grievance, and one black female--were paid less than McClendon. *Id.* at 125. Iacullo also noted that George Harvey and Dionne Winesberry had not signed McClendon's grievance or otherwise indicated that they agreed with his complaint about pay discrimination. *Id.*

On March 6, 2008, Stumpner issued McClendon a written reprimand for an incident that happened two weeks earlier at an Illinois toll plaza. *See* Dkt. No. 95-2 at 93. One of McClendon's work crews encountered resistance from a toll plaza employee when they attempted to use one I-Pass for four IDOT vehicles [*11] after responding to an emergency pothole complaint. *Id.* According to Stumpner, McClendon

exhibited poor supervision during the incident because he failed to inform Stumpner that his work crew was allegedly rude to the toll plaza employee and that the Illinois state police had been called to the scene. *Id.*[1] Giovanni Fulgenzi ("Fulgenzi"), the Personnel Services Manager for District 1, concurred in Stumpner's disciplinary action and issued a written reprimand to McClendon on March 12, 2008. *Id.* at 92. McClendon thinks Stumpner used the tollway incident as an opportunity to retaliate against McClendon because of his unionizing efforts and complaints about pay discrimination. McClendon Dep. at 58, 61.

On January 9, 2009, McClendon filed a grievance protesting Stumpner's refusal to appoint him as the South Area Operations Manager (a position that had been vacant since 2004) on an acting basis. *See* Dkt. No. 95-2 at 132. McClendon argued that Yard Technicians with less seniority had been allowed to serve as acting Area Operations Managers [*12] and later obtained promotions. *Id.* McClendon characterized IDOT's promotion of less senior Yard Technicians as "discriminatory" and accused the agency of "cronyism." *Id.* IDOT swiftly denied McClendon's grievance three days after he filed it on the ground that the agency's decisions about the acting Area Operations Manager position reflected its "policy of continuity." *Id.* at 130-31.

A few weeks later, on February 5, 2009, McClendon filed a grievance challenging his most recent annual performance evaluation. *Id.* at 136. McClendon's immediate supervisor, Tricia Robinson, gave him the highest possible rating, but Stumper lowered his rating because of an incident that occurred during a snowstorm in December 2008. *Id.* Stumpner wrote, "During this rating period, Mr. McClendon directed his maintenance yard to go home despite the Storm Duty Manager [sic] orders to keep four trucks and a LW [lead worker] out." *Id.* at 142. In his grievance, McClendon argued that this incident fell outside of the December 2007 to November 2008 rating period for his performance evaluation. *Id.* McClendon also asked Stumpner why he would not allow an "exceeds expectations" rating from a black supervisor, Tricia Robinson, to stand while he would [*13] overturn a white supervisor's ratings. McClendon Dep. at 141. Stumpner ultimately granted McClendon's grievance and corrected his 2008 performance evaluation. Dkt. No. 95-2 at 135.

Two weeks later, on February 17, 2009, McClendon filed a second grievance--similar to the one he filed in January

2008--alleging that minority yard technicians were being discriminated against with regard to pay, allocation of equipment, overtime hours, and job assignments. *Id.* at 565. McClendon said he had raised these issues with his supervisors--in some cases as early as 2003--to no avail. *Id.* McClendon referenced the possibility of legal action, but urged IDOT to address his concerns in a cooperative fashion. IDOT did not immediately act on McClendon's grievance.

In April 2009, Iacullo, Stumpner, and Schivarelli announced that all of the maintenance yards in District 1 would be consolidated for the summer months. McClendon Dep. at 34. Under the yard consolidation plan, McClendon was initially assigned to lead a day labor crew. *Id.* at 53-54. Iacullo and Stumpner then transferred McClendon from the day labor crew to manage the Alsip yard, which was known for having racial tensions. *Id.* at 77, 193. While McClendon was training as a Maintenance [*14] Cadre in 1999 or 2000, Stumpner attempted to assign him to the Alsip yard, but encountered resistance. *Id.* at 48. The Yard Technician and Lead Worker at the Alsip yard allegedly commented on the color of McClendon's skin and told Stumpner to send him elsewhere. *Id.*

McClendon objected to his reassignment to the Alsip yard in 2009 and told Stumpner, "You are just doing this because of my efforts." *Id.* at 79. After McClendon started his assignment at the Alsip yard, white employees began to request transfers because they did not want to work for a black supervisor. *Id.* at 79-80. McClendon's interactions with some of the white employees under his supervision became hostile--to the point that they used racial slurs against him--but Iacullo and Stumpner did nothing when the issue was brought to their attention. *Id.* at 190-91. When McClendon reported that employees had called him a nigger, commented about his car, and even called the police on him, Stumpner told McClendon that he needed to have tougher skin. *Id.* at 191. McClendon repeatedly requested a transfer out of the Alsip yard and eventually returned to the I-57 yard in 2010. *Id.* at 83.

On July 14, 2009, an IDOT grievance panel held a hearing to consider McClendon's two grievances relating to the [*15] Area Operations Manager position (filed in November 2007 and January 2009, respectively) and his two grievances relating to racial disparities in pay (filed in January 2008 and February 2009, respectively). The three member grievance panel concluded (1) that IDOT had not violated

---

[1] In 2006, Stumpner wrote up McClendon for poor supervision even though McClendon was on an approved vacation on the day of the underlying incident. McClendon Dep. at 63-67.

any provision of its personnel policies manual in not appointing McClendon to the Area Operations Manager position on an acting basis and (2) that McClendon had failed to present evidence showing that he was being paid less than other Yard Technicians because of his race. *Id.* at 157. IDOT Secretary Gary Hannig adopted the panel's recommendations and denied McClendon's grievances. *Id.* at 158.

At some point between 2008 and 2010, as McClendon's grievances were escalating, Stumpner called McClendon and two other black employees, George Martin and Hiram White, into his office. McClendon Dep. at 153, 166. Stumpner said they needed to get with the program or quit. *Id.* at 153. McClendon responded, "Is this about the three Negroes or three amigos?" *Id.* The three amigos was a reference to John Bilski, Ray Frais, and Jack Neven, three white employees who started during the Blagojevich administration and were advancing faster than McClendon despite [*16] having less seniority. *Id.* During one of McClendon's previous conversations with Stumpner about race discrimination, McClendon brought up IDOT's treatment of Tony Ross, an African-American technician at the Alsip yard. *Id.* at 155. Stumpner responded that he did not want "this kind working for him." *Id.* McClendon interpreted Stumpner's remark as a comment about race. *Id.* at 155, 225. Ross ended up resigning from IDOT. *Id.* at 225.

### D. McClendon's termination

The events that led to McClendon's termination occurred in parallel with the series of grievances he filed between November 2007 and February 2009.

In 1999 or 2000, McClendon told Stumpner that he was going to start teaching a commercial driver's license ("CDL") course at Olive-Harvey College in Chicago, Illinois. Stumpner Dep. at 169.[2] Stumpner asked McClendon to obtain assurance from the college that his teaching schedule would not interfere with his IDOT work, such as responding to snowstorm calls and other emergencies. *Id.* at 169-70. To assuage Stumpner's concerns, McClendon presented him with a letter from Olive-Harvey College stating that it would allow McClendon to prioritize his IDOT job duties over his teaching duties if there was ever a conflict between the two. *Id.* at 170.

In 2006, IDOT implemented a new policy that required every employee with a secondary job to submit a form

identifying the job and obtain his or her supervisor's approval. *Id.* at 165-66, 203. The next year, IDOT circulated a memo indicating that the secondary employment form must be submitted on an annual basis. *Id.* at 174.

In February 2008--while McClendon's first grievance alleging racial disparities in pay was still pending--Stumpner learned that McClendon had never submitted a secondary employment form and instructed him to complete one. *Id.* at 172-73, 198-99. Stumpner does not recall how this issue came to his attention. *Id.* at 172-73. McClendon thought his prior conversation with Stumpner and the letter he submitted from Olive-Harvey College satisfied IDOT's secondary employment requirements, but he agreed to submit the new form. *Id.* at 173-74. McClendon completed the form on or around February 28, 2008 and presented it to Stumpner for signature. *Id.* at 174-75, 198, 220.

Stumpner signed and dated the form, but did not approve McClendon's secondary employment based on his concern about how many hours McClendon claimed to be [*18] working at Olive-Harvey College (i.e., thirty per week). *Id.* at 175-76, 206. Stumpner expressed this concern to McClendon, who agreed to obtain another letter from the college indicating that it would allow McClendon to prioritize his IDOT work schedule. *Id.* at 176. For reasons not apparent from the record, McClendon did not obtain such a letter from Olive-Harvey College and present it to Stumpner until January 2009. *Id.* at 202.

At his deposition, Stumpner testified that he was never concerned about a possible overlap between the hours McClendon reported on his IDOT timecard and his Olive-Harvey teaching schedule until the Office of Executive Inspector General ("OEIG") announced its findings about that issue in June 2010. *Id.* at 183-84. In fact, Stumpner said the first time he even learned that OEIG was investigating McClendon's time records was in November 2008 when they interviewed him. *Id.* at 193-94. Before OEIG released its report, Stumpner claims that his only concern with McClendon's outside employment was whether he could leave class to address IDOT emergencies. *Id.* at 184.

In actuality, Iacullo and Stumpner were both aware that IDOT had launched an internal investigation into McClendon's work hours in March 2008, only weeks after IDOT had denied his [*19] grievance alleging race discrimination in pay. On March 14, 2008, IDOT's personnel manager, Fulgenzi, informed Iacullo and Stumpner that he

---

[2] McClendon [*17] says that he started teaching at Olive-Harvey College in 2002, *see* McClendon Dep. at 11, but the precise start date of his outside employment is irrelevant.

had contacted Olive-Harvey College to check on McClendon's class schedule. *Id.* at 204.

About one week later, Fulgenzi copied Iacullo and Stumper (among others) on an email to IDOT's Office of Quality Compliance and Review in which Fulgenzi reported the findings of his investigation. *Id.* at 212. Fulgenzi's report began by saying, "In the course of a civil rights investigation, it was brought to our attention that Mr. McClendon holds a secondary employment with the Chicago City Colleges where he is a driving instructor in CDL courses offered at Olive-Harvey campus." Pl.'s Ex. 9 at 001139. Fulgenzi learned from Olive-Harvey College that McClendon taught class five nights per week from 4:00 pm to 10:00 pm. *Id.* Fulgenzi then compared McClendon's teaching schedule and his IDOT sign in sheets from December 2007 through March 2008. *Id.* After noting that McClendon "has worked extensive overtime during off hours," Fulgenzi concluded that some of McClendon's reported IDOT hours "would surely be in conflict with his work schedule at Olive-Harvey." *Id.* at 001140. Specifically, Fulgenzi highlighted [*20] thirty instances of McClendon reporting overtime hours between 4:00 pm and 10:00 pm when he was supposedly teaching. *Id.*

In terms of next steps, Fulgenzi recommended referring the matter to OEIG for further investigation--namely, to obtain records showing the hours that McClendon actually worked at Olive-Harvey College. *Id.* at 001141. OEIG promptly launched its own investigation into McClendon's reported overtime hours. Stumper was interviewed by OEIG investigators in November 2008 and later provided them with copies of IDOT directives relating to work hours. *Id.* at 184, 192, 219. The investigators told Stumpner they were looking into McClendon's time records and questioned him about time cards and sign sheets they had already gathered. *Id.* at 191-93. OEIG never interviewed Iacullo. Iacullo Dep. at 168.

McClendon recalls OEIG investigators removing his office computer in 2008. McClendon Dep. at 89-90. They told McClendon he was the subject of an anonymous complaint, but would not disclose the specific allegations against him. *Id.* at 90. In December 2008, OEIG investigators interviewed McClendon in the presence of his attorney about his secondary job. McClendon Dep. at 91-92.

In January 2009, McClendon presented Stumpner with a letter from [*21] Olive-Harvey College stating that it would continue to accommodate his IDOT work schedule. *Id.* at 202. Upon receiving this letter, Stumpner surprisingly *approved* McClendon's secondary employment--and granted a grievance McClendon had filed relating to the delayed approval--even though IDOT's internal investigation had concluded that McClendon "surely" engaged in timecard fraud and OEIG's investigation was still ongoing. Stumpner Dep. at 179, 201, 215. Stumpner says the letter satisfied his earlier concerns about McClendon's secondary employment. *Id.* at 195, 202t.

In June 2010, OEIG concluded that (1) McClendon engaged in unauthorized secondary employment from 2006 until February 2008; (2) McClendon had submitted fraudulent overtime hours; and (3) Stumpner had abdicated his supervisory responsibility by failing to approve or deny McClendon's secondary employment request in February 2008.[3] Due to imprecision in IDOT's and Olive Harvey's timekeeping practices, OEIG could not say with certainty that McClendon had defrauded either employer. Instead, OEIG simply compared his time records--as Fulgenzi did before referring the matter for further investigation in March 2008--and found it more likely than not that McClendon [*22] had submitted fraudulent IDOT overtime hours when he was actually working at Olive-Harvey College.

On August 17, 2010, McClendon filed an internal discrimination and harassment complaint in which he recounted the various incidents documented in his previously filed grievances and attempted to rebut OEIG's findings. *See* Dkt. No. 95-2 at 160-66. McClendon explained that he had a "special arrangement" with Olive-Harvey College that allowed him to prioritize IDOT work and correct any discrepancies in his timesheets by working outside of his scheduled hours or submitting an amended time card. *Id.* at 161-62.

IDOT held a pre-disciplinary meeting with McClendon on August 23, 2010 in its Schaumburg office. After the hearing, McClendon submitted a written rebuttal to the charges against him in which he reiterated that his timesheets at Olive-Harvey College were completed two weeks before pay days. *Id.* at 118-19. McClendon further explained, "If I missed a day was late or had to leave early I informed the office secretary in order for her to make the necessary adjustments to payroll or to work an off day upon the director's approval." *Id.* at 119.

On September 14, 2010, IDOT fired McClendon, ostensibly [*23] because of OEIG's finding that he had submitted

[3]  *See* https://www.illinois.gov/oeig/Documents/08-00249_McClendon_121610.pdf (last visited July 31, 2015).

2015 U.S. Dist. LEXIS 101343, *23

fraudulent overtime hours. Iacullo and Stumpner participated in and supported the decision to fire McClendon. Stumpner Dep. at 185-86, 188. Stumpner initially claimed that he relied solely on OEIG's report when deciding to support McClendon's termination. *Id.* at 188. Later, after Stumpner was confronted with Fulgenzi's email from March 2008 concluding that McClendon's reported overtime hours "surely" overlapped with his Olive-Harvey teaching schedule, Stumpner admitted that IDOT uncovered the facts that ultimately led to McClendon's termination and forwarded them to OEIG for further investigation. *Id.* at 214-15.

In contrast to McClendon, an IDOT Yard Technician named Wilmer Caraballo was suspended for only seven days and given an opportunity to resign after OEIG concluded in January 2011 that he had misused state time and a state vehicle, falsified his time records, and violated IDOT's conflict of interest policy. *Id.* at 235-36.

**E. EEOC charge and lawsuit**

McClendon contacted the U.S. Equal Employment Opportunity Commission ("EEOC") on September 15, 2010, one day after IDOT fired him. The EEOC sent McClendon a letter the next day explaining that he needed to complete an intake [*24] questionnaire to begin the charge filing process. *See* Pl.'s Ex. 12. McClendon then completed an intake questionnaire--in which he alleged race discrimination and retaliation--and mailed it to the EEOC on November 16, 2010. *Id.*

On August 31, 2011, McClendon filed a formal charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation. Dkt. No. 95-2 at 169. Four months later, in December 2011, EEOC advised McClendon that his charge was untimely and issued him a right to sue letter. *Id.* at 171.

In his amended complaint, McClendon claims that IDOT fired him because of his race (Count I) and retaliated against him for complaining about race discrimination (Counts II). He also claims that Iacullo and Stumpner retaliated against him after he complained about race discrimination (Count III); violated his equal protection rights by discriminating against him because of his race (Count IV); and violated his *First Amendment* rights by retaliating against him because he supported the Republican Party and attempted to unionize the Yard Technicians (Count V).

**II. Statute of limitations defense**

As a preliminary matter, IDOT argues that McClendon's termination and retaliation [*25] claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.*, are time barred because he did not file an EEOC charge until August 31, 2011, more than 300 days after IDOT fired him. *See Bass v. Joliet Public Sch. Dist. No. 86, 746 F.3d 835, 839 (7th Cir. 2014)* ("Title VII provides that a charge of employment discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice, in deferral states like Illinois."). McClendon counters that the three-page complaint he filed with the EEOC in September 2010 and the completed intake questionnaire he submitted in November 2010 are the functional equivalent of a formal EEOC charge for purposes of the 300 day limitations period.

In *Federal Express Corp. v. Holowecki, 552 U.S. 389, 128 S. Ct. 1147, 170 L. Ed. 2d 10 (2008)*, the Supreme Court held that "if a filing [with the EEOC] is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Id. at 402*. "[U]nder this permissive standard a wide range of documents might be classified as charges." *Id.* "[T]he filing must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate [*26] its machinery and remedial processes." *Id.*; *see also* 29 C.F.R. § 1601.12(b) (Title VII regulation stating that "a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of").

*Holowecki* compels the conclusion that McClendon's three-page complaint and completed intake questionnaire satisfy Title VII's charge filing requirement. In his first communication with the EEOC in September 2010, McClendon asserted that he had been fired because of his race, described several of the incidents at issue in this case, and asked the EEOC to tell him if he had any "recourse." *See* Pl.'s Ex. 8. McClendon submitted an intake questionnaire two months later at EEOC's request in which he reiterated his belief that IDOT had fired him because of his race and in retaliation for complaining about discrimination. *Id.* McClendon's submissions are materially indistinguishable from the two filings that the Supreme Court deemed sufficient to satisfy the charge filing requirement in *Holowecki*: a six-page affidavit in which the complainant asked the EEOC to take action and a completed [*27] intake questionnaire. *552 U.S. at 405-6*; *see also Philbin v. Gen. Electric Capital Auto Lease, Inc., 929 F.2d 321 (7th Cir. 1991)* (per curiam) (holding that EEOC intake questionnaire

satisfied statutory charge filing requirement); *Steffen v. Meridian Life Ins. Co., 859 F.2d 534 (7th Cir. 1988)* (same). Therefore, IDOT's statute of limitations defense fails.

## III. Merits

On the merits, Defendants are entitled to summary judgment only if they "show[] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc., 477 U.S. at 248*.

### A. Title VII and Section 1981 retaliation claims

In Counts II and III, McClendon claims that Defendants retaliated against him because he accused IDOT of paying minority Yard Technicians less than their white peers.

The same legal standard applies to McClendon's retaliation claims under Title VII (Count II) and *42 U.S.C. § 1981* ("*Section 1981*") (Count III). See *Mintz v. Caterpillar, Inc., 788 F.3d 673, 679 (7th Cir. 2015)*. Iacullo and Stumpner are correct that individual employees may be held liable under *Section 1981* only if they "participated" in the retaliatory conduct. *Carter v. Chicago State Univ., 778 F.3d 651, 657 (7th Cir. 2015)*. Here, *Section 1981*'s personal involvement requirement is easily satisfied because of Stumpner's testimony that he and Iacullo participated in and supported the decision to [*28] fire McClendon. Stumpner Dep. at 185-86, 188. Whether a jury could find that they acted with retaliatory intent is a separate question addressed below as part of the causation analysis.

Under the direct method of proof, McClendon is entitled to a trial on the merits if he presents evidence "(1) that he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that there was a causal link between the protected activity and the employment action." *Hobgood v. Illinois Gaming Board, 731 F.3d 635, 642 (7th Cir. 2013)*.

Defendants' argument that McClendon did not engage in any statutorily protected activity is disingenuous. To be sure, not all of McClendon's grievances accused IDOT of engaging in race discrimination. See *Crawford v. Metro.*

*Gov't of Nashville and Davidson Cnty., Tenn., 555 U.S. 271, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009)* (Title VII's anti-retaliation provision protects employees who have "opposed any practice made an unlawful employment practice by this [statute]" (quoting *42 U.S.C. § 2000e-3(a)*)). Defendants, however, overlook the fact that McClendon explicitly complained about racial discrimination on at least four occasions: (1) between 2005 and 2007 during Secretary Martin's open forum in District 1; (2) in his January 2008 grievance concerning racial disparities in pay; (3) in his January 2009 grievance concerning the Acting Operations [*29] Manager position; and (4) in his February 2009 grievance alleging a broad array of discrimination against minority Yard Technicians. To say that McClendon did not engage in any statutorily protected activity is to ignore this litany of evidence.

The second element of McClendon's retaliation claims--which asks whether he was subjected to an adverse employment action--also requires little discussion. Title VII's ban on retaliation "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53, 64, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*. "Rather, Title VII's anti-retaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. N.A. Stainless, LP, 562 U.S. 170, 174, 131 S. Ct. 863, 178 L. Ed. 2d 694 (2011)* (quoting *White, 548 U.S. at 68*). Defendants argue that White was not subjected to any adverse actions because he successfully grieved Stumpner's decision to downgrade his 2008 performance evaluation. See Dkt. No. 96 at 12. That fact is neither here nor there. McClendon was fired, which is a quintessentially adverse action.[4] See *Tomanovich v. City of Indianapolis, 457 F.3d 656, 664 (7th Cir. 2006)* (firing an employee "clearly constitute[s] a materially adverse action" for purposes of a retaliation claim).

The crux of McClendon's retaliation claims is whether a reasonable jury could find that Defendants retaliated against him because he complained about race discrimination. See *Univ. of Tex. SW Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013)* ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."). McClendon has not presented direct evidence of causation--i.e., something akin to an admission that IDOT fired him

---

[4] Although McClendon complains about a wide variety of workplace issues, he has [*30] not argued that anything other than his termination constitutes an "adverse action" for purposes of his discrimination and retaliation claims. Nor is he pursuing a hostile environment claim relating to the Alsip Yard.

because of his protected activities--so he must rely on circumstantial evidence.

"A convincing mosaic [of circumstantial evidence] must include evidence from which an inference of retaliatory intent could be drawn." *Hobgood v. Illinois Gaming Bd., 731 F.3d 635, 643 (7th Cir. 2013)*. The accepted categories of circumstantial evidence that, taken together, may support an inference of causation that include:

> "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically [*31] receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action."

*Teruggi v. CIT Group/Capital Finance, Inc., 709 F.3d 654, 659-60 (7th Cir. 2013)*.

I start with McClendon's evidence of suspicious timing. In January 2008, McClendon filed a grievance alleging that IDOT was engaging in pay discrimination against minority Yard Technicians. This was certainly not the first grievance McClendon filed during his employment at IDOT. What distinguishes the January 2008 grievance from McClendon's previous complaints is his explicit allegation of race discrimination and IDOT's response. Whereas IDOT had swiftly rejected McClendon's previous grievances, this time the agency opened a parallel inquiry into his secondary employment with Olive-Harvey College.

In February 2008, Stumpner says that it somehow came to his attention that McClendon had not completed a secondary employment form pursuant to an IDOT policy implemented in 2006. A jury could reasonably find a causal connection between (1) McClendon's grievance alleging race discrimination and (2) IDOT's sudden, unexplained interest in a secondary employment form that should have been completed two years earlier and apparently did not matter to IDOT until shortly after [*32] McClendon engaged in protected activity. To dismiss the temporal proximity between these two events as pure coincidence would be inconsistent with the summary judgment standard.

In March 2008, IDOT concluded that some of McClendon's reported overtime hours were "surely" in conflict with his Olive-Harvey teaching schedule. Pl.'s Ex. 9 at 001140. Iacullo and Stumpner were copied on the email in which Fulgenzi reported this finding to IDOT headquarters and recommended referring the matter to OEIG for further

investigation. OEIG's final report repeated Fulgenzi's methodology on a larger scale and inferred, on the basis of overlapping time sheets, that McClendon had probably submitted fraudulent IDOT overtime hours. IDOT claims that it fired McClendon solely on the basis of OEIG's findings.

A reasonable jury could find that IDOT's stated basis for firing McClendon was a pretext for retaliatory motives. *See Vaughn v. Vilsack, 715 F.3d 1001, 1008 (7th Cir. 2013)* (focus of pretext inquiry is whether "proffered reason for [adverse action] is a lie"). IDOT concluded in March 2008 that McClendon had "surely" submitted fraudulent overtime hours--which was supposedly a fireable offense--yet it kept him on the payroll for another year and a half while [*33] OEIG was investigating the matter. IDOT may have been waiting for corroborating evidence, but OEIG's final report added little to the factual basis that already existed for firing McClendon in March 2008. At a minimum, the long delay between IDOT's finding that McClendon had submitted fraudulent overtime hours and its decision to fire him raises a triable question of fact about whether the stated reason for his termination was a lie. The notion that IDOT, Iacullo, and Stumpner would knowingly allow McClendon to continue claiming fraudulent overtime hours for one and a half years before firing him is sufficiently implausible to support an inference of pretext. *See Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 791 (7th Cir. 2007)* (employee may establish pretext by "identify[ing] such weaknesses, implausibilities, inconsistencies, or contradictions in [employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [employer] did not act for the asserted non-discriminatory reasons").

Stumper's testimony also casts doubt on IDOT's stated reason for firing McClendon in September 2010. Stumpner approved McClendon's secondary employment in January 2009 even though (a) IDOT had concluded in March 2008 that McClendon was [*34] "surely" engaging in timecard fraud and (b) OEIG was still investigating the matter. Stumpner admits that his actions made no sense if IDOT had truly been concerned about McClendon's outside employment. *See* Stumpner Dep. at 222.

Moreover, Stumpner provided conflicting testimony about when he first became aware of OEIG's investigation and a possible overlap between McClendon's overtime hours and his teaching schedule. Stumpner initially said he was unaware of OEIG's investigation until November 2008 and unconcerned about McClendon's claimed overtime hours until OEIG released its findings in June 2010. When

confronted with emails from March 2008, however, Stumpner admitted that he knew about IDOT's investigation into McClendon's outside employment and OEIG's follow on investigation from their inception. Stumpner's shifting statements about what he knew and when he knew it call into question whether IDOT's stated reason for firing McClendon was truthful or a pretext for retaliation. *See Castro v. DeVry Univ., Inc., 786 F.3d 559, 577 (7th Cir. 2015)* ("As a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision.").

In sum, McClendon is entitled to present [*35] his retaliation claims to a jury because of (1) the suspiciously close timing between his grievance about race discrimination and IDOT's sudden interest in scrutinizing his outside employment; (2) the implausibility that IDOT would knowingly allow him to continue submitting fraudulent overtime hours for one and a half years before firing him for that offense; and (3) Stumpner's mysterious approval of McClendon's outside employment in January 2009 and his shifting statements about when he learned about IDOT's internal investigation and OEIG's follow on investigation. *See Hobgood, 731 F.3d at 644* (denying employer's motion for summary judgment because of circumstantial evidence that employer launched a "retaliatory witch hunt" with a predetermined outcome shortly after employee engaged in protected activity).

## B. Termination claims

McClendon lacks direct evidence that IDOT fired him at Iacullo's and Stumpner's recommendation because of his race, so I analyze his termination claims (Counts I and IV) under the indirect method of proof. That method applies equally to Title VII and *Section 1983* equal protection claims. *See Rodgers v. White, 657 F.3d 511, 517 (7th Cir. 2011)*.

> To survive summary judgment under this method, [McClendon] must produce evidence that he (1) belongs to a protected class, [*36] (2) met his employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class.

*Id.* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))*. "If [McClendon] satisfies these elements, he must then prove that any legitimate, nondiscriminatory reasons offered for

the adverse action are pretext." *Id.*

McClendon is a black male who was fired, so he easily satisfies the first and third elements of the indirect method. IDOT argues that McClendon was not meeting their legitimate performance expectations because OEIG uncovered evidence that he was submitting fraudulent overtime hours. McClendon counters that IDOT treated a similarly situated, non-black employee more favorably after OEIG found that he also submitted fraudulent overtime hours. In cases of allegedly discriminatory discipline, the second and fourth elements of the *McDonnell Douglas* framework merge such that the proper inquiry is "whether [the non-black] employee engaged in similar misconduct yet received lighter punishment." *Baker v. Macon Resources, Inc., 750 F.3d 674, 676 (7th Cir. 2014)*.

Defendants argue that McClendon's proposed comparator, Wilmer Caraballo, is not similarly situated because "OEIG['s] investigation indicated that [*37] Carabello [sic] falsified his timekeeping records on four or five days, not for six years, and Carrabello [sic] was not getting paid by another employer as a result of him falsifying his timekeeping record." Dkt. No. 96 at 8-9. A reasonable jury *could* distinguish McClendon and Caraballo on those two grounds, but that is not the only way to view the evidence. OEIG did not have direct evidence that the overtime hours McClendon submitted were fraudulent. It simply drew an inference on the basis of McClendon's overlapping time sheets. Neither IDOT nor OEIG investigated McClendon's explanation for the apparent overlap (i.e., that Olive-Harvey College allowed him to correct any discrepancies between his timesheet and the hours he actually worked by working unrecorded hours outside his normal schedule or submitting an amended timecard).

In contrast to the circumstantial evidence against McClendon, OEIG agents witnessed Caraballo engage in time card fraud on each of the five days they surveilled him in October and November 2009.[5] Caraballo also admitted to OEIG agents during an interview that he occasionally took one to two hour lunch breaks and rarely documented these extended breaks on his [*38] timesheets. He also admitted that, over the course of four or five months, a personal friend visited him at the Gurnee Yard once a week for one to two hours at a time. In other words, OEIG agents uncovered direct evidence that Caraballo submitted fraudulent time cards on one hundred percent of the days they surveilled him and obtained damning admissions from him whereas they uncovered only circumstantial evidence against McClendon.

---

[5]   *See* https://www.illinois.gov/oeig/Documents/09-00645_Caraballo_06.17.11.pdf (last visited July 31, 2015).

As for Defendants' argument that McClendon's misconduct was more serious than Caraballo's because McClendon was cheating both IDOT and Olive Harvey College, there is no evidence in the record supporting that contention. OEIG concluded that McClendon had submitted fraudulent timesheets to IDOT, not Olive Harvey College or both employers.

Viewing the evidence in the light most favorable to McClendon, a jury could reasonably find that Caraballo's misconduct was at least as serious as McClendon's, yet McClendon received more severe punishment. Defendants' disparate treatment of McClendon and a similarly situated, non-black comparator raises an inference of discrimination. The additional steps in the *McDonnell Douglas* burden shifting [*39] framework are redundant here because McClendon can use the same comparator evidence to rebut Defendants' argument that OEIG's findings constituted a legitimate, non-discriminatory reason for firing him. *See Coleman, 667 F.3d at 841* ("[A]n employment discrimination plaintiff may demonstrate pretext by providing evidence that a similarly situated employee outside her protected class received more favorable treatment.").

The bottom line is that McClendon is entitled to a trial on his termination claims against IDOT, Iacullo, and Stumpner. A jury must decide whether Defendants' disparate treatment of McClendon and Caraballo has a non-discriminatory explanation.

## C. *First Amendment* retaliation claim

McClendon's final claim is that Iacullo and Stumpner retaliated against him because he engaged in protected *First Amendment* expression.

"To succeed, [McClendon] must make out a prima facie case of retaliation, demonstrating that: '(1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's actions.'" *Kidwell v. Eisenhauer, 679 F.3d 957, 964 (7th Cir. 2012)* (quoting *Massey v. Johnson, 457 F.3d 711, 716 (7th Cir. 2006))*.

The third factor, causation, is fatal to McClendon's claim that Iacullo and Stumpner fired him because he supported the Republican [*40] Party. McClendon disclosed his political affiliation to Stumpner in 2000 or 2004 when he asked for vacation time to attend former President George W. Bush's inauguration. In 2005, Iacullo and Stumpner ordered a search of McClendon's office for evidence of whether he was engaging in political activities on the job. In

the aftermath of that search, a jury could infer from Iacullo's comments that he was aware of McClendon's political affiliation. The final incident with political overtones occurred in February 2008 when Eugene Davis--who appeared to have political ties with the IDOT's Democratic administrators--was sent to oversee the operations at McClendon's maintenance yard for one day.

No reasonable jury could find that these three incidents were a substantial or motivating factor for IDOT's decision to fire McClendon in September 2010. The search of McClendon's office that Iacullo and Stumpner ordered in 2005 arguably shows that they targeted him because of his political affiliation, but this occurred five years before the adverse action at issue in this case. *Id. at 966* (suspicious timing does not give rise to an inference of causation unless adverse action follows "close on the heels" [*41] of protected activity). The Eugene Davis incident occurred closest in time to McClendon's termination--two and a half years beforehand--but had only mild or vague political overtones. I do not question McClendon's subjective belief that his political views hurt his career at IDOT. With that said, he has not presented evidence from which a reasonable jury could conclude that his political views were a substantial or motivating factor in IDOT's decision to fire him. *See Sanchez v. Henderson, 188 F.3d 740, 747 (7th Cir. 1999)* ("[A]s a matter of law, mere knowledge of the plaintiff's protected activity prior to an adverse employment action does not establish a retaliatory motive.").

McClendon's claim that Iacullo and Stumpner retaliated against him because of his union organizing activities also fails on causation grounds. McClendon started his union organizing activities between 2005 and 2007 after former IDOT Secretary Martin told him that collective bargaining was the only way to address his complaint about Yard Technician salaries. Stumpner warned McClendon that he might cause problems for himself by advocating for minority workers, but he did not express hostility to the idea of unionizing per se. McClendon later attended a hearing in 2008 [*42] or 2009 at which Iacullo testified that Yard Technicians were managers who could not effectively perform their duties if they joined the same union as the employees they supervised. McClendon says he made a final attempt to unionize the Yard Technicians in June 2010, but he provides no detail about his specific activities or whether Iacullo and Stumpner were aware of them.

On the evidentiary record McClendon has presented, no reasonable jury could find that his union organizing activities played a role in the series of events that led to his termination in September 2010. Again, the fact that Iacullo

2015 U.S. Dist. LEXIS 101343, *42

and Stumpner were aware of McClendon's attempts to unionize the Yard Technicians--and took an opposing stance on the issue--does not support an inference that they retaliated against him. *Id.*

## IV. Conclusion

In conclusion, I deny Defendants' motion for summary judgment on McClendon's termination and Title VII retaliation claims (Counts I through IV), but grant their motion with respect to his *First Amendment* retaliation claim (Count V).

**ENTER ORDER:**

/s/ Elaine E. Bucklo

**Elaine E. Bucklo**

United States District Judge

Dated: July 31, 2015

**A** Neutral

As of: December 3, 2015 4:31 PM EST

## *Dauska v. Green Bay Packaging Inc.*

United States District Court for the Eastern District of Wisconsin

August 5, 2014, Decided; August 5, 2014, Filed

Case No. 12-C-925

**Reporter**

2014 U.S. Dist. LEXIS 107438; 2014 WL 3843547

JOHN DAUSKA, Plaintiff, v. GREEN BAY PACKAGING INC. and GREEN BAY PACKAGING INC. SEVERANCE PLAN, Defendants.

**Prior History:** *Dauska v. Green Bay Packaging, Inc., 291 F.R.D. 251, 2013 U.S. Dist. LEXIS 68375 (E.D. Wis., 2013)*

## Core Terms

severance, terminated, employees, retire, benefits, eliminated, severance pay, contends, asserts, pension, calculations, two weeks, files, declaration, ascertain, notice, severance agreement, summary judgment, without cause, informal, unequivocal, paying, plans, reasonable person, year of service, Interrogatory, eligible, parties, memo, administrative employee

## Case Summary

### Overview

HOLDINGS: [1]-A former employee timely filed an administrative complaint of age discrimination after the employee's termination since the employer's threat to eliminate the employee's position if the employee did not retire did not provide an unequivocal notice of termination, and the termination did not occur until the employer provided notice that the position would be eliminated on a specific date; [2]-The employee failed to show that the employer's course of conduct established an unwritten plan for severance governed by the Employee Retirement Income Security Act, *29 U.S.C.S. § 1001 et seq.*, since the employee failed to show that the employer granted severance pursuant to an identifiable and consistent pattern or formula, and the employer's general policy of paying severance did not override the employer's discretion in severance decisions.

### Outcome

Motion for summary judgment granted in part and denied in part.

**Counsel:** [*1] For John Dauska, Plaintiff: Jill S Weinstein, Pedersen & Weinstein LLP, Chicago, IL.

For Green Bay Packaging Inc, Green Bay Packaging Inc Severance Plan, Defendants: David H Weber, Liebmann Conway Olejniczak & Jerry SC, Green Bay, WI.

**Judges:** William C. Griesbach, Chief United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### DECISION AND ORDER PARTIALLY GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

Plaintiff John Dauska, a former employee of Defendant Green Bay Packaging, Inc. (GBP), filed this action on September 11, 2012, alleging that GBP discriminated against him and eventually forced him to retire in violation of the Age Discrimination in Employment Act (ADEA), *29 U.S.C. § 621 et seq.* (Compl. ¶¶ 31-33, ECF No. 1.) Dauska also claims that GBP and Defendant Green Bay Packaging Inc. Severance Plan (the Plan), an entity that GBP contends does not exist, failed to pay him severance benefits in violation of the Employee Retirement Income Security Act (ERISA), *29 U.S.C. § 1001 et seq.* (Compl. ¶¶ 35-40.) Although GBP did not have a formal written severance plan, Dauska asserts that GBP's policies and past practices created a plan subject to ERISA. The complaint also asserts state law claims for failing [*2] to pay wages in violation of *Section 109.03 of the Wisconsin Statutes* and breach of an express or implied contract. (Compl. ¶¶ 41-50.) For the reasons stated below, GBP's motion will be granted in part and denied in part.

### I. Background

GBP is a manufacturer of corrugated paper products with headquarters located in Green Bay, Wisconsin. (Def's

Proposed Findings of Fact (DPFOF) ¶ 1, ECF No. 38.) Dauska was originally hired by GBP as its Corporate Personnel Director in 1979, and he worked for the company without any written employment contract until February 2011. (*Id.* ¶¶ 2-3, 54.) Dauska contends that he was forced to retire against his wishes at the age of 66 solely because of his age. Prior to his retirement, Dauska acted as the Corporate Director of Industrial Relations and Personnel. (Dauska Dep. at 48:13-14, ECF No. 48-1.) In this role, Dauska's responsibilities included "being chief spokesperson on the company's behalf during the union contract negotiations; and also other labor issues, mediations, arbitrations, contract interpretations . . . ." (*Id.* at 48:17-22.) He had "wide discretion" in his role (*id.* at 59:5-7), but he asserts that GBP began to reduce his job duties in 2005 [*3] and transferred many of his duties to other employees in subsequent years. For example, he contends that in 2005, he was stripped of "lead responsibility for the 401(k) plan, the medical and dental benefit plans, and participation in the administration of the pension plans." (*Id.* at 65:4-8.) He also claims that he was denied the title of "Vice President" because of his age. He asserts that when he asked for the title, he was told that the company felt it was not the right time to make company offices. (*Id.* at 131:7-133:20.) Within two months, however, the company gave the title to an employee about ten years younger than Dauska. (*Id.*) Dauska contends he was equally as qualified for the promotion as the younger candidate. (*Id.*) He further submits that during his 32 years at GBP, he was never written up, he consistently received annual pay raises, and he was entered into GBP's deferred compensation plan, an perk available to only a small number of employees. (Pl's Proposed Findings of Fact (PPFOF) ¶¶ 5-8, ECF No. 47.)

In June 2010, GBP General Counsel Scott Wochos, Dauska's immediate supervisor, first approached Dauska about the subject of retirement. (Dauska Dep. at 30:5-10.) Wochos [*4] testifies that he approached Dauska about the issue because GBP was "paying him a lot of money to do about a third of a job." (Wochos Dep. at 44:2-5, ECF No. 48-3.) After giving Dauska time to think about retirement, Wochos met with Dauska again in early July 2010. Dauska asserts he informed Wochos he had no interest in retiring in the near future and in response, Wochos told him that if he was not willing to retire, Wochos would eliminate his position. (Dauska Dep. at 233:25-235:5.) Dauska also claims he asked Wochos if he would receive severance and Wochos said that he would not be offered severance. (*Id.* at 233:20-21.) Dauska then asked Wochos if he could speak with GBP President Will Kress about Wochos' decision, and Wochos arranged a meeting. (*Id.* at 235:22-236:10.) Dauska reported to Kress that Wochos gave him the option to voluntarily retire or face the elimination of his job, he expressed that he was upset and believed he was being forced to retire because of his age, and he told Kress that retiring before the age of 66 would be a hardship for him. (*Id.* at 84:18-85:12, 86:9-12.) Dauska asserts that although Kress did not directly comment on Wochos' statements, he described [*5] approvingly the philosophy of a former manager who believed that all managers should retire at age 65. (*Id.* at 85:15-21.) Dauska again met with Wochos following his meeting with Kress, and he claims Wochos told him that according to Kress, he agreed to stay on only until his 66th birthday. (*Id.* at 94:7-16.) Dauska states he denied agreeing to retire and informed Wochos that he only told Kress that retirement before age 66 would be a hardship for him. (*Id.*) Dauska testifies that in response, Wochos again said he would eliminate Dauska's position if he did not retire. (*Id.* at 94:22-95:3.) Dauska claims Wochos then indicated he did not have time to talk further about the matter and that the two could pick up the conversation at a later time. (*Id.* at 93:1-6.) Dauska contends he attempted to schedule appointments through Wochos' administrative assistant on two occasions, but neither attempt resulted in a meeting. (*Id.* at 93:11-18.)

On January 6, 2011, Wochos emailed Dauska: "Confirming our discussions over the past 6-9 months, we have delayed, at your request, the elimination of your position. We will meet your request of last summer that the elimination not take place until February 14, [*6] 2011." (Wochos Dep. Ex. 18, ECF No. 48-3.) Dauska's employment ended in February 2011 as scheduled, and on August 1, 2011, he filed an administrative complaint of age discrimination with the Equal Employment Opportunity Commission (EEOC) Chicago District Office. (Weber Decl. Ex. C, ECF No. 41-3.)

## II. Summary Judgment Methodology

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago, 119 F.3d 1286, 1291 (7th Cir. 1997).* A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. *Fed. R. Civ. P. 56(e)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

The moving party has the burden of showing there are no facts to support the nonmoving party's claim. *Celotex Corp.*

*v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In determining whether summary judgment is proper, a court **[*7]** must construe the evidence in the light most favorable to the non-moving party. *Anderson, 477 U.S. at 255*. There is no genuine issue of material fact, and therefore no reason to go to trial, when no reasonable jury could find in the non-moving party's favor. *Smith v. Lafayette Bank & Trust Co., 674 F.3d 655, 657 (7th Cir. 2012)*.

### III. Analysis

#### A. Age Discrimination

GBP contends Dauska's ADEA claim is time-barred because he failed to file an administrative charge with the EEOC within the requisite period. To pursue a civil action under the ADEA, a Wisconsin plaintiff must file a charge with the EEOC within 300 days after the alleged unlawful conduct occurred. *29 U.S.C. § 626(d)(1)(B)*; *29 C.F.R. § 1626.7* (" . . . [I]n a case where the alleged discriminatory action occurs in a State which has its own age discrimination law and authority administering that law, [a charge must be filed] within 300 days of the alleged discriminatory action, or 30 days after receipt of notice of termination of State proceedings, whichever is earlier."); *Thelen v. Marc's Big Boy Corp., 64 F.3d 264, 267 (7th Cir. 1995)*. The 300-day clock begins to run when the alleged illegal act of discrimination was made—not **[*8]** the date on which the employee was terminated. *Delaware State Coll. v. Ricks, 449 U.S. 250, 258, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980)* ("[t]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful.") (citations omitted).

The Seventh Circuit has "adopted an 'unequivocal notice of termination' test to determine the date that an employee has been terminated." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (quoting *Dvorak v. Mostardi Platt Assocs., Inc., 289 F.3d 479, 486 (7th Cir. 2002))*. Under this test, "termination occurs when the employer shows, by acts or words, clear intention to dispense with the employee's services." *Id.* There are two prongs to the test, both of which must be satisfied to fix the date of termination: "First, there must be a final, ultimate, nontentative decision to terminate the employee. . . . Second, the employer must give the employee 'unequivocal' notice of its final termination decision." *Flannery v. Recording Indus. Ass'n of Am., 354 F.3d 632, 637 (7th Cir. 2004)*.

GBP claims Wochos unequivocally communicated a final decision to terminate Dauska in their July 2010 meeting

when he offered **[*9]** Dauska two options: retire or your position will be eliminated. If true, Dauska's claim would be time-barred because he waited more than one year to file his EEOC charge. Dauska asserts that "things had been unresolved and left up in the air" after their summer 2010 meetings and that Wochos did not give him a termination date until January 6, 2011. (Pl's Br. at 9, ECF No. 46.)

In support of its argument that Dauska's termination occurred in July 2010, GBP relies on Dauska's own testimony regarding his understanding of his meeting with Wochos at that time:

> Question: . . . Your supervisor had told you as early as June that he wanted you to be retired or job eliminated in the year 2010, correct?
>
> Answer: In June it — the conversation was strictly "retired." The aspect of job elimination first occurred during our second meeting in July.
>
> Question: Well, when he told you in July that your job was going to be eliminated, it was: You need to retire or your job's going to be eliminated, and it's going to happen in 2010. That was what was told to you, right?
>
> Answer: That is correct.

(Dauska Dep. at 121:4-16.) GBP argues that Dauska's own account of the July 2010 meeting supports GBP's argument that **[*10]** Wochos' notice of termination was unequivocal. Additionally, following the July 2010 meeting Dauska e-mailed GBP Director of Human Resources Mike Georgia to say that he was either retiring or having his job eliminated in 2010 and wished to gather information about his retirement benefits. (*Id.* at 96:5-8.) GBP further notes that after Dauska spoke with Kress, he admits Wochos again reiterated that his position would be eliminated if he did not retire. (*Id.* at 94:22-95:3.) In the months preceding Dauska's termination, GBP contends, it did not waiver in its decision:

> Question: Your testimony is that that was the company's position until your actual 66th birthday when you were retired or your position was eliminated, depending on your perspective?
>
> Answer: The position being that —
>
> Question: That you would have to retire or face elimination of your position.
>
> Answer: Yes.
>
> Question: No one ever took it back?
>
> Answer: No one ever took it back.

Question: And you always understood that was going to be the case?

Answer: Yes.

(*Id.* at 95:7-19.) Based on this evidence, GBP contends that Dauska's claim with the EEOC was untimely and his action is therefore barred.

GBP has confused its unequivocal notice of [*11] its intent to terminate Dauska if he did not retire with an unequivocal notice of termination. It is the latter that is required in order to trigger the statute of limitations. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 849 (11th Cir. 2000) ("Quite simply, the 180-day charge filing period does not run until the plaintiff is told that she is actually being terminated, not that she might be terminated if future contingencies occur."). Here, the evidence shows that as early as July 2010 GBP threatened Dauska with termination, or more specifically, elimination of his job, if he did not retire, but it did not provide him unequivocal notice of termination. Indeed, had he elected to voluntarily retire, the company would not have terminated him at all. Nor was it clear and unequivocal when his termination would occur if he did not retire. Wochos originally planned to eliminate Dauska's position in 2010. Following Dauska's meeting with Kress, Wochos expressed his understanding that Dauska had agreed to retire when he turned 66. When Dauska denied any such agreement, Wochos again repeated that Dauska's position would be eliminated if he did not retire, but he did not say when. It [*12] was not until January 6, 2011, when Wochos sent Dauska the email telling him that his position would be eliminated on February 14, 2011, that Dauska had unequivocal notice of his termination.

A mere threat to take some job action against an employee is not enough to trigger the statute of limitations under Title VII. If the rule were otherwise, " litigants would be forced to file a charge at every hint of termination in order to preserve their claims" and "[t]he concomitant burden upon the EEOC would impact significantly the enforcement function of the agency." *Flannery, 354 F.3d at 641*. In this case, for example, until Wochos' email telling him that his job was being eliminated on February 14, Dauska had no idea when he would be terminated. Although Wochos believed that he had agreed to retire on his 66th birthday, Dauska denied that he had any such plans. Thus, the question of when his position would be eliminated was left open until Wochos advised Dauska on January 6 that February 14 would be his last day.

Neither *Ricks* nor *Lever* are to the contrary. Both cases involved the allegedly discriminatory denial of tenure. In both cases the courts held that it was the denial of tenure that [*13] triggered the statute of limitations, not the termination of employment. The termination of employment was the "delayed, but inevitable, consequence of the denial of tenure." *Ricks, 449 U.S. at 257-58*. The denial of tenure in each case constituted an employment action that the plaintiffs in each case alleged was taken for discriminatory reasons. Notice of that action was enough to trigger the statute of limitations. In this case, in contrast, GBP took no action against Dauska in July of 2010, and provided no notice of any action affecting his employment until January 2011, when it told him his position would be eliminated on February 14. It was only then that he was provided unequivocal notice of his termination. Since his claim was filed within three hundred days of that date, it is timely and need not be dismissed.

As to the merits of Dauska's claim, there are material factual disputes that preclude granting summary judgment on the record as it now stands. Dauska has offered both direct and circumstantial evidence that, if believed by a jury, could support a finding in his favor. For example, Dauska argues that Kress made a comment suggesting he thought that all managers should retire [*14] at age 65. Dauska notes that even before he was told to retire or face elimination of his position, his duties were being transferred to younger employees and he was denied the title of vice president despite the fact that it had been awarded to his predecessors. GBP contends that Dauska was not meeting its legitimate performance expectations, but Dauska has offered evidence from which a jury could conclude otherwise, including the fact that poor performance was not offered as a reason for terminating him until after the litigation commenced. Based on the evidence presented, the Court is satisfied that the record does not permit judgment as a matter of law. Accordingly, GBP's motion will be denied as to Dauska's ADEA claim.

**B. ERISA**

Dauska contends that through its course of conduct, GBP established an ERISA plan which entitles him to severance pay. He asserts GBP had an informal policy of paying employees who had been involuntarily terminated without cause two weeks of severance for each year of service, up to one year of severance pay, and that he was wrongfully denied such a benefit when he was terminated without cause. Before addressing the merits of Dauska's ERISA claim, the Court [*15] will address his motion to strike and motion for sanctions.

**1. Motions to Strike and for Sanctions**

The subject of these motions is GBP's discovery obligation to disclose documents related to its past practice of paying severance to employers who were involuntarily terminated without cause. On May 14, 2013, the Court granted in part Dauska's motion to compel and ordered GBP to respond to interrogatories and document requests seeking such information. (ECF No. 18.) Dauska's "Interrogatory No. 1" asked GBP to "identify every person involuntarily separated from employment with [GBP] at any time during the years 2006 through the present and for each such person state the following": (a) name; (b) address/phone; (c) dates of employment; (d) positions held; (e) date of termination; (f) reason for termination; (g) whether person was offered severance; (h) severance amount and manner of calculation; (i) amount actually paid. GBP supplemented its answer to the interrogatory following the Court's May 2013 order by producing "Exhibit B," a spreadsheet listing former employees who had entered into severance agreements which contained columns for division, separation date, employee name, and age. [*16] (*See* 7/8/13 Suppl. Answers, ECF No. 51-1.) GBP also stated in its supplemental response that it had "collected and produced the payroll files maintained regarding the employees listed in Exhibit B . . . . These are the files that would contain copies of the Severance Agreements entered into by the employees listed on Exhibit B and contain other available and responsive information to the subparts of this interrogatory." (*Id.*) Dauska construed GBP's response to mean that instead of providing a written response to subparts (a)—(i) in Interrogatory No. 1, GBP was producing the employee files, which contained all responsive information to the interrogatory.

Dauska contends that at least 35 of the employee files GBP produced did not provide a start or end date, and that without this information, he was unable to calculate years of service for all employees listed in Exhibit B. Dauska asserts that GBP "knowingly and purposely" withheld this information but then used it to support its own summary judgment materials. In support of its motion for summary judgment, GBP submitted the declaration of James M. Ledvina, an attorney for GBP who attested to making the following calculations:

5. Of the [*17] 159 involuntary office/administrative employee separations from February 2006 to 2011 shown on GBP's discovery responses, 130 (or 81.76%) received severance.

6. During the same period of time set forth above, I calculated the percentage of employees who received between one to two weeks of severance for every year of service and the percentage of employees who received exactly 2 weeks of severance for every year of service. Of the 130 office and administrative employees who did receive severance, 62 employees (or less than half) received between one to two weeks of severance for every year of service. Of the 130 office and administrative employees who did receive severance, only three employees received exactly two weeks of severance for every year of service.

(Ledvina Decl. ¶¶ 5-6, ECF No. 40.) In Paragraph four of his declaration, Ledvina referenced the Declaration of Scott Wochos, who attested that to assist Ledvina, GBP created a summary of severance information form the payroll and personnel files GBP had produced. (Wochos Decl. ¶ 12, ECF No. 39.) GBP then utilized the facts summarized by Ledvina in Proposed Facts 88-90 and its supporting memorandum. (ECF Nos. 37 & 38.) Dauska contends [*18] that Ledvina could not possibly have made such calculations unless GBP withheld information regarding start and end dates. He further contends that GBP's statements are improper because GBP failed to provide Dauska or the Court the information Ledvina claims to have reviewed, and that in any event, it appears Ledvina relied on a previously produced list of all GBP employees (Exhibit AA) instead of the most updated version, a document labeled GBP06671-06703. Dauska moves the Court to sanction GBP pursuant to *Fed. R. Civ. P. 37(b)(2)(A)* by: (1) prohibiting GBP from opposing Dauska's claim that involuntarily terminated office and administrative employees received two weeks of severance per year of service up to a year, and that vice presidents received two years of severance pay; and (2) striking the Declaration of James Ledvina and GBP's proposed facts 88-90. He also seeks attorney's fees pursuant to *Fed. R. Civ. P. 37(b)(2)(C)*.

GBP characterizes Dauska's motions as a misguided attempt to capitalize on an inadvertent mistake. GBP explains that as part of its supplemental response to Interrogatory No. 1, GBP produced more than one hundred payroll and personnel files, and Wochos, the GBP [*19] employee responsible for responding to the request, mistakenly assumed that GBP's electronic human resource system was duplicative of GBP's paper files. (Wochos Decl. ¶ 4, ECF No. 54.) GBP contends that it utilized the electronic system to compile the data analyzed by Ledvina and was unaware that some of the paper files no longer contained records of start and end dates. After Dauska filed his motion to strike, GBP recognized its error and provided Dauska a chart that provided the dates he was missing. (Georgia Decl. ¶ 7, ECF No. 55.) GBP argues that Dauska's motions are untimely because he has had the personnel files for over a year, and

given his knowledge of HR procedures, he should have known that missing start and end dates could have been located in the electronic system. In addition, GBP contends that Dauska suffered no prejudice from GBP's late disclosure of the dates. After GBP provided the missing dates on May 6, 2014, Dauska did not challenge the factual assertions in paragraph 6 of Ledvina's declaration involving years of service. Further, GBP contends that presenting information in summary form, as it did in Ledvina's declaration, was proper given the volume of information [*20] in this case. GBP also notes that Dauska possessed the information Ledvina relied upon in his calculations and that Dauska could have raised any factual or mathematical objection in his response to the summary judgment motion.

The Court will deny both motions. There is no evidence that GBP intentionally removed information from the paper files or knew that some of the files lacked start and end dates. GBP's explanation as to why it failed to produce the information is credible, and it is implausible that GBP would have knowingly obscured information and then blatantly relied upon that information in its summary judgment motion. Parties seeking to conceal or spoliate evidence typically do not cite the missing evidence and call attention to their transgressions. Although GBP erred in assuming that the paper files contained the same information as its electronic system, GBP acted quickly to supplement the missing information when Dauska filed his motion to strike. Dauska's request that the Court prohibit GBP from opposing his claim that GBP employees received two weeks of severance per year of service is puzzling under the circumstances. Dauska does not contend that evidence has been permanently [*21] spoliated, and as of May 6, 2014, Dauska has possessed all the information he would need to compare the amount of severance pay each employee received to his or her years of service in the company. Despite possessing all the information Ledvina relied upon in paragraph 6 of his declaration, Dauska did not challenge Ledvina's factual assertions in his motion to strike or motion for sanctions and has not sought leave to supplement his summary judgment materials. His failure to do so suggests that he has not found mistakes in calculation, and the Court is not inclined to prohibit GBP from making an argument when the facts supporting that argument are readily available to both parties.

Further, the Court does not find sanctions appropriate for GBP's alleged failure to provide Dauska or the Court with the materials underlying Ledvina's calculations in paragraphs 5 and 6 of his declaration. The data underlying the calculations (both Exhibit AA and GBP06671-06703) had been produced to Dauska, and he could ascertain which

documents GBP relied upon in making the calculations. As GBP notes, Ledvina's calculations involved nothing more than basic arithmetic operations and were based on the data [*22] of fewer than 160 employees. Dauska had the opportunity to challenge Ledvina's factual assertions, which he did with respect to paragraph 5 of the declaration in his summary judgment materials. GBP's failure to provide summary spreadsheets with its summary judgment materials under the circumstances is not a sanctionable offense and does not warrant striking Ledvina's declaration or GBP's proposed facts. Additionally, as for Dauska's claim that Ledniva's calculations were erroneously based on Exhibit AA instead of GBP06671-06703, GBP has demonstrated that this was inconsequential. Ledvina's supplemental declaration indicates that using GBP06671-06703, he calculates that 81.01% of GBP employees received severance, which is actually lower than the 81.76% GBP initially calculated using Exhibit AA. (Ledvina Decl. ¶ 6, ECF No. 56.)

In sum, although Dauska was justified in seeking the missing data from GBP, the problem was quickly remedied and Dauska has failed to show (or even assert) that the missing data supports his arguments on the merits. Additionally, Dauska has failed to demonstrate that Ledvina's declaration and GBP's proposed facts rely on data that Dauska does not possess. Dauska's [*23] motion for sanctions and motion to strike are therefore denied, and his request for attorney's fees is also denied. The Court now proceeds to address the merits.

**2. Severance Benefits Claim**

ERISA imposes fiduciary duties on employers that establish or maintain an employee benefit plan such as a severance plan. *See 29 U.S.C. § 1002(1)(B)*; *Id. § 186(c)*. Although employee benefit plans must be in writing, *29 U.S.C. § 1102(1)*, the courts have held that there need not be a writing in order for a plan to exist. *Brines v. XTRA Corp., 304 F.3d 699, 701 (7th Cir. 2002)* ("[C]ourts reason that a failure to comply with that requirement should not redound to the company's benefit."). In *Donovan v. Dillingham*, the Eleventh Circuit set out the prevailing test for determining whether a "plan" has been established within the meaning of ERISA:

> In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

*688 F.2d 1367, 1372 (11th Cir. 1982)*. The Seventh Circuit joined a host of [**24**] other circuits by adopting this test in *Diak v. Dwyer, Costello & Knox, P.C., 33 F.3d 809, 812 (7th Cir. 1994)*. In *Diak*, plaintiff Diak worked at an accounting firm and was never told that the firm had a pension plan. *Id. at 810*. Diak then discovered after he retired that the firm had paid pension benefits to some retired employees. *Id.* Specifically, he discovered that a retiree with 16 years of service received $75/month plus medical and dental coverage, a retiree with 36 years of experience received $100/month and dental insurance, a retiree with five years of experience received medical and dental insurance, and a retiree with 55 years of experience received $1,000/month. *Id.* Diak brought an ERISA claim asserting that the firm administered a "plan" under which he was entitled to benefits. *Id.* The firm argued that the pension payments were not made pursuant to a "pension plan" and instead were individual contracts executed upon each person's retirement. *Id. at 811*. Applying the *Donovan* criteria, the court held that the terms of the alleged plan were not ascertainable by a reasonable person, explaining:

> Few DCK retirees received any benefits, and the benefits paid were clearly not [**25**] calculated according to an established plan, but rather represented ad hoc arrangements with each individual. With only this evidence, we could not begin to fashion appropriate relief for Diak, since we do not know whether he was the type of employee DCK intended to cover, or what benefits are due. We also note that there was no evidence that Diak expected a pension; rather, he was expressly told in 1985, just before he "retired," that DCK had no pension plan.

*Id. at 813*.

As the Court observed in its May 2013 order, several courts, including the Seventh Circuit, have recently questioned whether the *Donovan* approach is compatible with two subsequent decisions of the Supreme Court that emphasize different considerations when determining whether an informal policy is a "plan." (ECF No. 18.) In *Fort Halifax Packing Co. v. Coyne*, the Court addressed a statute providing that "any employer that terminates operations at a plant with 100 or more employees, or relocates those operations more than 100 miles away, must provide one week's pay for each year of employment to all employees who have worked in the plant at least three years." *482 U.S. 1, 5, 107 S. Ct. 2211, 96 L. Ed. 2d 1(1987)*. The Court held that the statute did not [**26**] create plans subject to ERISA because "the requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control." *Id. at 12*. Courts have gleaned from *Fort Halifax* that "an ERISA plan requires an ongoing administrative scheme." *Cvelbar v. CBI Illinois Inc., 106 F.3d 1368, 1374 (7th Cir. 1997)*. In *Massachusetts v. Morash*, the Court addressed whether a bank's policy of paying unused vacation time out of its general funds constituted an ERISA plan. *490 U.S. 107, 110, 109 S. Ct. 1668, 104 L. Ed. 2d 98 (1989)*. The Court explained:

> In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds. . . . To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator. Because [**27**] ordinary vacation payments are typically fixed, due at known times, and do not depend on contingencies outside the employee's control, they present none of the risks that ERISA is intended to address.

*Id. at 115* (citation omitted). Thus, in *Morash* the Court looked more to the purposes of ERISA and considered whether employee expectations would be defeated if ERISA did not apply.

In *Sandstrom v. Cultor Food Science, Inc.*, the Seventh Circuit noted that "[b]oth *Morash* and *Fort Halifax* evince reluctance to find that regular and predictable awards of severance or vacation payments establish a 'plan,' given the frequency with which these benefits are the subject of bilateral negotiations between employers and departing employees." *214 F.3d 795, 797 (2000)*; *accord Golden Gate Restaurant Ass'n v. City & County of San Francisco, 546 F.3d 639, 652 (9th Cir. 2008)*. Similarly, in *Brines*, the court cited *Sandstrom* and *Morash* for the proposition that it may be "better to describe informal plans as simple contracts, enforceable under state law rather than under ERISA." *304 F.3d at 702*. The court observed that there is "a fair bit of judicial skepticism about 'informal plans'—specifically whether by [**28**] allowing their concoction by imaginative counsel in litigation employers will actually be deterred from offering certain types of benefit." *Id.* (citing *Sprague v. Gen. Motors Corp., 133 F.3d 388, 403 (6th Cir. 1998)* ("For us to sanction informal 'plans' or plan 'amendments'—whether oral or written—would leave the law of employee benefits in a state of uncertainty and would

create disincentives for employers to offer benefits in the first place.")). *Sandstrom* and *Brines* did not explicitly overrule *Diak*, however, and an employer's informal benefit scheme may still constitute an ERISA plan in this Circuit. Nevertheless, the cases following *Donovan* and *Diak* counsel that in assessing alleged informal plans, courts should be cautious not to impose ERISA requirements on employers who exercise discretion in severance decisions and create no expectation of entitlement to severance pay. *See Brines, 304 F.3d at 704* ("The normal understanding of severance pay (when not provided for in a written plan), as of bonuses, is that it is at the discretion of the employer.").

Here, Dauska asserts that GBP had an informal severance plan and that the terms of the informal plan entitle him to benefits under [*29] the plan. Like the plaintiff in *Diak*, his claim is not based upon a direct promise of severance. Dauska had no written contract containing a severance provision, and he does not recall anyone at GBP making an express promise that he would receive severance under any circumstances. (Dauska Dep. at 164:4-8.) As noted above, Dauska asserts Wochos informed him in their July 2010 meeting that he would not receive severance pay. (*Id.* at 233:20-21.) GBP contends that its severance agreements were ad hoc agreements with outgoing employees and that GBP created no expectation of severance. GBP Chief Financial Officer Joseph Baemmert acknowledges that the company paid severance to many employees but asserts that severance decisions were made "on a case-by-case basis" by the outgoing employee's immediate ranking supervisor. (Baemmert Dep. at 69:15-19, ECF No. 48-4.) GBP contends that Dauska was not a fitting candidate for severance pay because he was allowed to stay employed from July 2010 to February 2011 even though GBP desired to eliminate his position sooner and because at age 65, he was already fully eligible for GBP's pension plan. Wochos claims he did not want to "create a precedent of [*30] offering severance to people who were a hundred percent pension eligible," (Wochos Dep. at 70:22-24), and that to his knowledge, "GBP has never paid severance to a departing employee who was allowed to pick a separation date six months after the company wanted to end his employment and who was fully eligible for his or her pension benefits." (Wochos Decl. ¶ 11, ECF No. 39.)

The parties primarily dispute whether the intended benefits and beneficiaries are ascertainable to a reasonable person and whether Dauska was in the class of intended beneficiaries. To support his claim, Dauska first points to his own experience and testimony of GBP executives. During Wochos' tenure, Dauska would be notified when an employee who was "qualified to receive severance" was

going to be terminated, and then he would put together documents for Wochos' review. Wochos would then give the documents back to Dauska, and he would present them to the affected individual. (Dauska Dep. at 170:20-171:4.) Dauska testified that the company's most recent policy had been to offer two weeks of severance for every year of service, not to exceed one year, with the exception of company vice presidents, who were granted two [*31] full years of severance. (*Id.* at 171:5-11.) Dauska also claims to lack knowledge of any employee whose employment was involuntarily terminated and who did not receive severance. (*Id.* at 209:4-7.) Baemmert also testified that although the starting point is "zero to one week" of severance, all the severance packages he had personally seen were offers of 1 to 2 weeks of severance pay. (Baemmert Dep. at 70:15-71:11.) Baemmert could not recall the name of a former employee who had been terminated without cause and did not receive a severance package. (*Id.* at 85:1-4.)

Second, Dauska contends that GBP's past practices reveal a plan with ascertainable terms. Dauska rejects GBP's assertion that 130 of 159 employees involuntarily terminated by GBP (or 81.76%) received severance. Of the 29 employees identified as receiving no severance, Dauska has submitted documents demonstrating that six resigned (and should be subtracted from the 159), six actually received some amount of severance, and seven were terminated for cause or misconduct. Of the remaining 10 employees, Dauska asserts that two employee files were lost or destroyed in a flood and the other eight do not state a reason for termination. [*32] (Weinstein Decl. ¶¶ 3-8, ECF No. 49-1.) Wochos testified that one of the employees whose file was destroyed was terminated for performance reasons. (Wochos Dep. at 145:16-146:1.) Dauska therefore contends that in reality, at most, only nine of 153 employees terminated without cause (5.9%) did not receive severance. Dauska further questions whether those nine were terminated without cause because no reason for termination stated in the files.

Third, Dauska asserts that a reasonable person can readily ascertain the plan's essential terms from a memorandum regarding severance agreements sent by Wochos to "All General Managers," "HR Personnel," and Dauska on September 5, 2008. The memo stated:

> To avoid any confusion as to when severance agreements are necessary for terminated employees, please contact me by phone or e-mail. In almost all cases, written severance agreements are required if a terminated employee is given more than two weeks of severance pay.
>
> With the exception of accrued vacation or other earned time off, there is no legal requirement to provide

severance pay. Generally, it has been the Company's practice to provide one to two weeks of severance pay per year of service for [*33] employees who are involuntarily terminated without cause. In exchange for severance pay beyond two weeks, the Company requires a written release of all claims under state and federal law and other written commitments from the employee.

We have several different templates for severance agreements, so please contact me whenever you believe a terminated employee should be paid more than two weeks of severance pay and I will promptly provide you with a draft agreement. . . .

(Dauska Dep. Ex. 13, ECF No. 48-1.) Dauska contends that from this memo, a reasonable person can ascertain the plan's intended benefits (1-2 weeks of severance per year of service) and beneficiaries (employees terminated without cause).

For an informal plan to constitute an ERISA plan, *Diak* instructs that the terms of the plan must be ascertainable by a reasonable person. *33 F.3d at 812*. In *Brines*, the Seventh Circuit likened this requirement to the well-established principle that vague contracts are unenforceable. *304 F.3d at 701* ("A court will not enforce a contract that is so vague that the court rather than the parties would have to formulate essential terms."). Here, Dauska's claim fails to satisfy *Diak* because a [*34] reasonable person cannot ascertain the intended benefits and beneficiaries of the alleged plan. Regarding intended benefits, under *Diak* "a plaintiff need not show the exact dollar amount [he] would expect to receive in benefits," but "there must be some evidence in the record from which the court can ascertain the benefits due under a plan." *33 F.3d at 812*. Dauska's testimony that GBP had a policy of paying two weeks of severance for every year of service, up to one year of severance, as well as the memo stating a general practice of paying 1-2 weeks per year of service, are contradicted by the undisputed factual assertions in paragraph 6 of Ledvina's declaration. Ledvina calculated that "[o]f the 130 office and administrative employees who did receive severance, 62 employees (or less than half) received between one to two weeks of severance for every year of service. Of the 130 office and administrative employees who did receive severance, only three employees received exactly two weeks of severance for every year of service." (Ledvina Decl. ¶ 6, ECF No. 40.) Since over half the employees terminated without cause received either more or less than 1-2 weeks of severance per year of [*35] service, a court could not begin to fashion a remedy for Dauska, assuming he were in the intended class of beneficiaries. Dauska has not proposed any explanation

as to why so many employees fall outside the 1-2 week category, and thus, even if he is correct that almost all (or all) of the 153 employees GBP identified received severance, a reasonable person could not determine whether Dauska's individual circumstances warrant a high-end or low-end severance package (or any severance at all). If there is no identifiable pattern or formula, this indicates that the severance agreements were ad hoc arrangements rather than disbursements made pursuant to a plan. *Diak, 33 F.3d at 813*.

Additionally, a reasonable person could not ascertain the intended class of beneficiaries and whether Dauska falls within that class. Wochos' memo uses the term "generally" and does not foreclose the possibility that an employee terminated without cause will not receive severance. As noted above, Dauska continued to work for more than six months after the decision was made to terminate his employment and he was already eligible to collect his full pension. The fact that Dauska was eligible for his full pension [*36] is especially significant because the general understanding of severance pay is that it is "intended to tide an employee over while seeking a new job," *Sly v. P.R. Mallory & Co., Inc., 712 F.2d 1209, 1211 (7th Cir. 1983)* (quoting district court), and is not intended to provide a "double windfall recovery," *Jung v. FMC Corp., 755 F.2d 708, 713 (9th Cir. 1985)*. There is evidence that GBP also had this understanding of severance pay, as the company had a policy of reducing a severance award if the individual obtained unemployment compensation. (*See, e.g.*, Severance Agreement of Brett M. Chambers at 1, Weinstein Decl. ¶ 5, Ex. 3, ECF No. 49-1 ("Should you receive any unemployment compensation for the salary continuation period, your salary continuation will be reduced in the amount of such compensation.").) Dauska points to examples of employees who worked after receiving notice of termination or were near retirement age but still received a severance offer: Karen Szczepanski was informed in April 2010 that her position would be eliminated in September 2010 but she still received one year of severance (Baemmert Dep. at 52:19-56:21; Baemmert Dep. Ex. 3); Debra Stevens was informed in September [*37] 2009 that her position would be eliminated in December 2010 but she still received one year of severance (Wochos Dep. at 121:9-122:13; Wochos Dep. Ex. 13); Terry Lyon was informed in March 2009 that his position would be eliminated in June 2009 and he still received one year of severance (Weinstein Decl. ¶ 13, Ex. 6); Robert Tackett was informed in August 2009 that his position would be eliminated in October 2009 but he still received nine months of severance, and because he was eligible for retirement, he also collected his pension (Wochos Dep. at 131:23-132:2; Wochos Dep. Ex. 21); Jeff Rusk was

informed in September 2007 that his employment would be terminated in December 2007 and he was offered the option of early of retirement or severance (Weinstein Decl. ¶ 12, Ex. 5.); and three employees—Brian Duffy, Ken Wiese, and Robert Pace—were offered severance until they reached age 62 and were eligible to collect their full pensions (Wochos Dep. at 136:13-16, 140:3-12, Weinstein Decl. Ex. 9). (*See* Pl's Resp. to DPFOF ¶¶ 63-64, ECF No. 47.)

These examples provide evidence that the characteristics at issue—working additional months and being pension-eligible—did not categorically exclude [*38] an individual from consideration for severance, but they do not support Dauska's claim nearly as much as he suggests. Only one of the employees listed above received severance and a pension simultaneously; in the other cases, GBP gave the employee the option of severance or early retirement or GBP paid severance as a bridge until the employee's pension kicked in. Thus, it appears GBP typically used severance for the traditional purpose of bridging a gap, sought to avoid windfall bonuses, and considered an employee's unique circumstances when constructing a severance offer. Although Robert Tackett received both severance and a pension, there is no evidence that Tackett's offer was typical for pension-eligible employees. Dauska does not provide the ages of the 9 individuals he concedes may not have received severance, and it is unclear how many of the 153 employees identified had reached retirement age when their severance decisions were made. In other words, Dauska has not offered evidence of an identifiable trend, and a single example cannot support the inference that GBP paid severance to *all* employees terminated without cause. It would be unreasonable, and contrary to the purposes [*39] of ERISA, to bind GBP to a policy of paying severance to all pension-eligible employees solely because it had done so on one prior occasion. *See Jung, 755 F.2d at 713* ("[P]olicy considerations behind ERISA suggest that double recovery should not be favored" because employers must keep their plans within reasonable cost).

Dauska's claim also fails because, as in *Diak*, there is no evidence that GBP ever intended to communicate the existence of a plan to a class of beneficiaries. *33 F.3d at 813*; *see also Morash, 490 U.S. at 115* ("[ERISA] established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's *expectation of the benefit* would be defeated through poor management by the plan administrator.") (emphasis added); *Gruber v. Hubbard Bert Karle Weber, Inc., 159 F.3d 780, 789 (3d Cir. 1998)* ("T]he crucial factor in determining whether a 'plan' has been established is whether the employer has expressed an intention to provide

benefits on a regular and long-term basis."). Dauska points to Wochos' memo as creating an expectation to severance, but as GBP notes, the express purpose of the memo was to instruct managers and HR personnel [*40] on procedure, not to communicate the existence of a plan to a class of beneficiaries. Dauska was privy to the contents of the memo based on his position with the company, but the memo was not circulated to all GBP administrative employees. *Cf. id* ("[T]here was evidence that the individual employer plans satisfied the . . . test for establishing an ERISA plan because each employee was given a copy of the summary plan description which indicated what benefits were available, which persons were eligible for coverage, the source of financing, and the procedures for receiving benefits."). GBP's individual severance agreements also contained confidentiality clauses and were considered confidential by GBP. (Dauska Dep. at 187:4-7.) Thus, the terms of GBP's "plan," and perhaps the very existence of severance packages, would not have been ascertainable by non-management employees. The evidence suggests that GBP sought to preserve its ability to exercise discretion in severance decisions; it made no express promises of severance and did not publish a formal plan. As in *Brines*, the Court finds no reason to upset the traditional understanding that severance pay, absent a written agreement, is [*41] at the discretion of the employer. *304 F.3d at 704*.

Because Dauska's claim fails under *Diak*, the Court need not consider whether GBP's severance agreements constituted an "ongoing administrative scheme" under *Fort Halifax*. One final point merits consideration, however. In addition to the reasons stated above, Dauska's claim also fails because there was no contract "implied in fact" between Dauska and GBP. In *Brines*, a class of plaintiffs sued former employer XTRA under ERISA after XTRA transferred part of its business to ContainerPort. *304 F.3d at 700*. The employees were offered the same employment by ContainerPort on essentially the same terms, but they claimed an entitlement to severance benefits from XTRA. *Id.* XTRA's previous written severance plan contained a severance formula, but prior to the transfer that plan was superceded by another which provided only that XTRA "will develop and implement an appropriate separation program if business and economic conditions necessitate a reduction in force." *Id.* The plaintiffs noted that after the old plan was superceded, XTRA continued to pay severance benefits to terminated employees according to the old formula, and they argued that this ongoing [*42] practice constituted an informal successor plan. *Id. at 702*. XTRA's executives stated that the practice only applied to employees not offered comparable positions by XTRA's affiliates. *Id.* The court held that XTRA's statements did not constitute an admission

of a severance benefit plan; rather, they were "merely descriptions of an acknowledged practice." *Id. at 703*.

The court concluded that "a practice does not create an obligation under the principles of contract law (the principles normally and here applicable to teasing out the obligations created by a pension or welfare plan governed by ERISA) unless it creates a contract 'implied in fact.'" *Id.* The court defined a contract implied in fact as "one in which behavior takes the place of articulate acceptance." *Id.* (discussing *Hobbs v. Massasoit Whip Co., 158 Mass. 194, 33 N.E. 495 (1893)* (Holmes, J.), a case in which the plaintiff (a seller of eel skins) had by reason of his previous dealings with the defendant (a purchaser of eel skins) good reason to believe that the defendant would either pay for or return a shipment of eel skins. Applying the principles of contract law, the court concluded that no contract implied in fact had [*43] been created: "The plaintiff . . . a supplier of labor . . . did not 'offer' to work in exchange for a promise of severance pay, and the defendant did not 'accept' the 'offer' by paying severance pay to other employees." *Id. at 704*. The same analysis applies here. There is no evidence that Dauska and GBP had previous dealings that could be construed as an "offer" of severance by GBP. Dauska does not claim he was terminated by GBP under similar circumstances on a prior occasion and received severance; instead, he again points to GBP's dealings with others. In effect, Dauska seeks "to use [GBP's] practice of paying severance pay not to explicate a contract but to create one." *Id. at 703*. Although GBP had a general policy of paying severance and had paid it to other employees, this did not create an implied contract between Dauska and GBP. Dauska's ERISA claim therefore fails as a matter of law.

**C. State Law Claims**

The ERISA analysis above also disposes of Plaintiff's state law claims for breach of an express or implied contract and failing to pay wages in violation of *Section 109.03 of the Wisconsin Statutes.* As discussed above, Dauska had no express or implied in fact contract with GBP [*44] entitling him to severance pay. *Section 109.03 of the Wisconsin Statutes* provides that employers must pay discharged employees wages (including severance pay) owed to them within a certain period of time. *See Wis Stat. §§ 109.01(3), 109.03(2)*. Since GBP had no contractual obligation to pay severance to Dauska, this claim also fails as a matter of law.

**IV. Conclusion**

For the foregoing reasons, GBP's motion for summary judgment (ECF No. 36) is GRANTED in part and DENIED in part. The motion is granted as to Dauska's ERISA and state law claims. It is denied as to his ADEA claim. Dauska's motion to strike the declaration of James M. Ledvina and Proposed Facts 88-90 (ECF No. 45) and his motion for sanctions against GBP for failing to produce certain discovery materials (ECF No. 51) are DENIED. The Clerk is directed to set this matter on the Court's calendar for a Rule 16 conference to address further scheduling. The parties may appear by telephone.

**SO ORDERED** this 5th day of August, 2014.

/s/ William C. Griesbach

William C. Griesbach, Chief Judge

United States District Court

◆ Positive

As of: December 3, 2015 4:32 PM EST

## *Zierke v. R.R. Donnelley & Sons Co.*

United States District Court for the Northern District of Illinois, Eastern Division

August 26, 1997, Decided

Case No. 94 C 7593

**Reporter**

1997 U.S. Dist. LEXIS 12925

SCOTT B. ZIERKE, Plaintiff, v. R.R. DONNELLEY & SONS COMPANY, Defendant.

**Subsequent History:** Adopting Order of September 23, 1997, Reported at: *1997 U.S. Dist. LEXIS 14837*.

**Disposition:** [*1] Recommended that this Defendant's Motion for Summary Judgment denied.

## Core Terms

group leader, Proofreading, disability, direct evidence, summary judgment, alleged statement, severance package, deposition, genuine issue of material fact, discriminatory, training, views, decision making process, constructive discharge, recommends, terminated, argues, module, paired, ranked, rated, discriminatory intent, laid off, individuals, lowest

## Case Summary

### Procedural Posture

Plaintiff former employee filed a claim against defendant former employer, alleging it discriminated against him and constructively discharged him in violation of the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12101 et seq.* The employer filed a motion for summary judgment. The case was referred to a magistrate judge.

### Overview

The employee who had worked as a proofreader technician that later advanced due to promotion, was missing his right hand. When the employer underwent a substantial workforce reduction he was laid off because he was one of three lowest ranked group leaders. He was given a choice to take severance or a lower position. He opted for the severance package, filed a charge, and was granted a notice of right to sue. He filed an action for discrimination. A magistrate

recommended that the employer's motion for summary judgment be denied, which the court adopted, finding that alleged statement's by the employers could have been interpreted as acknowledging a discriminatory intent, directly related to the decision making process. Such statements qualified as direct evidence and brought the case under Price Waterhouse analysis. Furthermore, his high performance appraisals just three months prior to his termination, raised suspicion. The statements combined with the denial of training advanced concerns as to the employee's proffered reason as pretext for a discriminatory motive. All the issues created material issues of fact in dispute, requiring examination by a trier of fact.

### Outcome

The court adopted the recommendation of the magistrate judge, and denied the employer's motion for summary judgment in a ADA discrimination case in which issues of constructive discharge, pretext, and the existence of the employee's handicap, were left for a trier of fact to decide.

**Counsel:** For SCOTT B SCOTT B. ZIERKE, plaintiff: Gary David Ashman, Paul William Pasche, Ashman & Stein, Chicago, IL.

Scott B Scott B. Zierke, plaintiff, Pro se, Murengo, IL.

For R. R. DONNELLEY & SONS, defendant: Janet Marie Hedrick, Paula Kay DeAngelo, Vedder, Price, Kaufman & Kammholz, Chicago, IL.

**Judges:** W. Thomas Rosemond, Jr., United States Magistrate Judge. Honorable Wayne R. Andersen, United States District Judge.

**Opinion by:** W. Thomas Rosemond, Jr.

## Opinion

TO: The Honorable Wayne R. Andersen

**United States District Judge**

*REPORT AND RECOMMENDATION*

**W. Thomas Rosemond, Jr., Magistrate Judge**

Plaintiff, Scott B. Zierke ("Zierke"), filed a claim against his former employer, R.R. Donnelley & Sons Company ("Donnelley"), defendant, alleging Donnelley discriminated against him and constructively discharged him in violation of the Americans with Disabilities Act ("ADA"). [1] Before the Court is *Defendant's Motion for Summary Judgment*. Upon reviewing the pleadings, deposition testimony, affidavits, briefs and other evidence in the record, the Court finds genuine issues of material fact exist, and therefore [*2] recommends *Defendant's Motion for Summary Judgment* be *denied*.

*UNDISPUTED FACTS*

Donnelley's Directory Service Center, located in Elgin, Illinois, prepares telephone directory "yellow page" advertisements through typesetting, layout and proofreading. [2] Donnelley hired Zierke on August 29, 1988, to work as a proofreader technician in the Proofreading Department of Donnelley's Elgin office. Zierke is missing his right hand.

[*3] As a proofreader technician, Zierke proofread advertisements to ensure their accuracy prior to printing. [3] Donnelley promoted Zierke to Group Leader on February 3,

1990. [4] As a Group Leader, Zierke continued to perform some proofreading, and also spent his time training, directing and expediting the work of proofreaders, and attended meetings concerning the resolution of manufacturing problems. [5]

In late 1992, Ameritech, a major Donnelley customer, announced it would no longer use Donnelley's Directory Services. [6] In May 1993, a large portion of Defendant's Elgin plant was destroyed by a fire. [7] Following the fire and the loss of Ameritech, defendant restructured its organization and underwent a substantial workforce reduction. [8] In the reorganization, Donnelley changed its structure from departments to "production modules," resulting in the elimination of the Proofreading Department where Zierke had functioned as a Group Leader. [*4] [9] Donnelley assigned Zierke to one of the newly created production modules. [10]

To implement its workforce reduction, Donnelley selected individuals to be terminated by utilizing a paired-comparison process involving the following five steps:

> **1.** a determination was made as to the number and type of employees to lay off because of the downsizing;

> **2.** those subjected to the layoff were then ranked against all their fellow coworkers with the same job title on a matrix whereby each individual was ranked better or worse than the other individuals by a group of managers and supervisors;

> **3.** based upon these comparisons, the individuals were then ranked from lowest to highest in terms of overall subjective performance;

---

[1]  42 U.S.C. § 12101 *et seq.* (1995).

[2]  *Defendant's Statement Of Undisputed Material Facts In Support Of Its Motion For Summary Judgment* (hereinafter, "Defendant's 12(M)"), at P1; *Plaintiff's Response To Defendant's Statement Of Undisputed Material Facts In Support Of Defendant's Motion For Summary Judgment* (hereinafter, "Plaintiff's 12(N)"), at P1. (Defendant's 12(M) and Plaintiff's 12(N) collectively referred to as "Undisputed Facts").

[3]  Undisputed Facts at P2.

[4]  Undisputed Facts at P3.

[5]  *Id.*

[6]  Undisputed Facts at P10.

[7]  Undisputed Facts at P4.

[8]  Undisputed Facts at PP4, 10.

[9]  Undisputed Facts at P4.

[10]  Undisputed Facts at PP4, 6.

**4.** depending on how many were slated to be laid off, those individuals who were ranked lowest [*5] would be laid off until the necessary number of workers were eliminated; and

**5.** those determined to be laid off would then be given the option of either receiving a severance package based on their former position, or the chance to "bump-and-compete" for a lower paying job within the organization. [11] [*6]

As part of the workforce reduction, Donnelley determined three of eleven Group Leaders would be terminated. [12] Thus, by utilizing the comparison process, the three individuals ranked lowest were laid off. [13]

Based upon the results of the sixteen raters used in this particular comparison process, Zierke was ranked one of the three lowest Group Leaders. [14] On November 1, 1993, Zierke was given the option of either receiving a severance package, or the chance to "bump-and-compete" for a lower paying proofreading technician job similar to the one he held before his promotion in 1990. [15] Zierke opted for the severance package. [16] Zierke filed a charge with the Equal Employment Opportunity Commission in November 1993 and was granted a notice of Right to Sue in September 1994. [17] This action commenced shortly thereafter.

### DISCUSSION

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions [*7]

on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [18] A genuine issue of material fact exists where a rational trier of fact could, based on the facts in the record, find for the non-moving party. [19] In deciding a motion for summary judgment, the Court views all facts in the light most favorable to the non-moving party. [20] In order to survive a summary judgment motion, the party opposing the motion must affirmatively demonstrate by specific factual presentations that there is a genuine issue of material fact that necessitates a trial. [21]

[*8] Plaintiff's complaint is brought pursuant to the ADA which states in pertinent part that:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. [22]

Zierke claims Donnelley violated the ADA by demoting him, denying him training opportunities, harassing him, and constructively discharging him due to his disabled status. A plaintiff can prove discrimination under the ADA through either the *Price Waterhouse* direct evidence method or the *McDonnell Douglas* indirect, burden-shifting method of

---

[11]   Undisputed Facts at PP10-13, 15-20. Though Zierke advances some contrary assertions or offers different characterizations of certain facts in the corresponding paragraphs of his 12(N) Statement, he cites to no evidence to support such assertions in these paragraphs, and thus, statements in Defendant's 12(M) are deemed admitted pursuant to Local Rule 12(N)(3). Furthermore, although Zierke claims Donnelley did not follow the paired comparison process, he testified in his deposition he had no reason to believe Donnelley deviated from its policy. Plaintiff's 12(N) PP11, 19; Appendix A, Deposition of Scott Zierke at 208-209.

[12]   Undisputed Facts at PP10-13, 15-20.

[13]   *Id.*

[14]   Undisputed Facts at P16.

[15]   Undisputed Facts at P21.

[16]   *Id.*

[17]   *Complaint* at P8; *Answer* at P8.

[18]   *Fed. R. Civ. P. 56(c)*; *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1388 (7th Cir. 1993).

[19]   *Fed. R. Civ. P. 56(e)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).

[20]   *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991).

[21]   *Beard v. Whitley County REMC*, 840 F.2d 405, 409-410 (7th Cir. 1988).

[22]   *42 U.S.C. § 12112(a)*.

proof. [23] Zierke has established a genuine issue of material fact under both methods.

*Price Waterhouse.* Under *Price Waterhouse*, [*9] Zierke must show by direct evidence that his disability played a motivating part in Donnelley's decision. [24] Under the so-called "mixed motives" case, Donnelley does not escape liability simply by presenting a non-pretextual legitimate reason for its decision. [25] Rather, Donnelley must prove by a preponderance of evidence it would have reached the same decision even if Zierke's disability had not been considered. [26] In order to shift this burden onto the defendant, a plaintiff must have direct evidence of discriminatory intent. [27]

In the present case, Zierke offers as evidence of discriminatory intent [*10] the alleged statements of Donnelley's Vice President, Jeff Relick ("Relick"), and Zierke's supervisor Harold Bryant ("Bryant"). Zierke submits the affidavit of coworker Carol Maloney ("Maloney"), who asserts the following discussion occurred between herself and Relick in May 1993 shortly after the fire Donnelley experienced:

> She asked him again why Mr. Zierke was the only group leader denied a desk, desk drawer and a phone. Finally Mr. Relick explained to her that there was not room for Mr. Zierke in Mr. Relick's organizational plans and that surely she could understand why. . . . Mr. Relick asked her what she thought a customer of R. R. Donnelley would think upon confronting Mr. Zierke. She asked Mr. Relick what he meant by that question. He replied that Mr. Zierke fell short of Mr. Relick's idea of an ideal employee. He said that the fact that Mr. Zierke only had one hand would cause customers as well as fellow employees to feel ill at ease when dealing with him.

> \*\*\*\*

> Mr. Relick quickly pointed out that handicapped people did not make him personally feel ill at ease, but he perceived that people in the business world were made

to feel ill at ease by viewing [*11] and working with a person who did not have a hand. Mr. Relick insisted that he had to be realistic. Mr. Relick concluded by saying that Scott Zierke did not fit into the total picture that he had planned for the Elgin facility of R. R. Donnelley & Sons. [28]

Zierke also submits his own deposition in which he testified to the following regarding an alleged conversation with Bryant:

Q. What did you say?

A. That's what I asked him [Bryant], I said what's happening. You are under-utilizing me. You are paying me group leader wages, I am reading ads. There is layoffs coming up and I am basically treading water here. I want to get more involved.

Q. What did he say?

A. He was agitated with me because I was basically asking him the same question I had asked him previously that Friday.

Q. What words did he use to express that?

A. He said that -- he explained to me that I slipped through the cracks and that I need to get up, dust myself off, and go on. As a black man I know this, and he said so should you.

Q. What else did he say?

A. He said nothing more than that. When he said so should you he [*12] motioned with his left hand to my right side, looking at my right side.

\*\*\*\*

Q. Are you still unsure about what Harold Bryant meant by that comment as you sit here today?

A. What he meant by it I will never know. What inferences I derived from it are my opinions.

Q. What inference do you derive from it?

---

[23] *DeLuca v. Winer Industries, Inc.*, 53 F.3d 793, 797 (7th Cir. 1995).

[24] *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989).

[25] *Price Waterhouse*, 490 U.S. at 241-242; *see also*, *Soodman v. Wildman, Harold, Allen & Dixon*, 1997 U.S. Dist. LEXIS 1495, 1997 WL 106257 at 7 (N.D.Ill.).

[26] *Price Waterhouse*, 490 U.S. at 242, 258; *Soodman*, 1997 U.S. Dist. LEXIS 1495, 1997 WL 106257 at 7.

[27] *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring in judgment).

[28] Plaintiff's 12(N) Exhibit H, *Affidavit of Carol Maloney* at 1-4.

1997 U.S. Dist. LEXIS 12925, *12

**A.** What I derived from it was that he was speaking to me as a minority, recognizing me as a minority and saying that these things happen to minorities. [29]

Direct evidence of discrimination is evidence that can be interpreted as either an explicit or implicit acknowledgment of discriminatory intent by the defendant or its agents. [30] Statements made by decision makers which relate to the decisional process itself can suffice to show "that decision makers placed substantial negative reliance on an illegitimate [*13] criterion in reaching their decision." [31] For isolated comments to be probative of discrimination, they must be temporally related to the discharge or causally related to the decision making process. [32]

Donnelley denies such statements were made by either Relick or Bryant. Furthermore, Donnelley argues that even *assuming arguendo* such statements were made, they do not bring the case under a *Price Waterhouse* framework. Donnelley argues Relick was never part of the decision making group which rated Zierke as one of the three lowest Group Leaders. Therefore, Donnelley contends, any stray remarks uttered by Relick do not qualify as direct evidence that an illegitimate factor motivated the decision to terminate Zierke. With respect to Bryant, Donnelley argues that [*14] Bryant gave Zierke the second highest rating in the paired comparison review, and thus, any remark he may have made was not indicative of a discriminatory viewpoint or animus towards Zierke's disabled condition.

Zierke acknowledges Relick did not directly participate in the paired comparison evaluation. However, Zierke alleges that as Bryant's superior, Relick arranged for Zierke to be relegated to a position which would set him up for failure. Zierke claims that when Donnelley eliminated the Proofreading Department and restructured its business, he was stripped of Group Leader responsibilities and denied computer training while other Group Leaders (with whom he was later compared to in the paired comparison process) continued to function in a Group Leader capacity and were given the means and training by which to do so. Zierke claims he was relegated strictly to the position of proofreader when he was assigned to the production module. Moreover, Zierke claims he was given a folding table instead of a desk and did not have a telephone which would be essential to performing Group Leader responsibilities. Zierke claims he was the only Group Leader relegated to such a position following [*15] Donnelley's restructuring.

Donnelley argues Zierke was never stripped of Group Leader responsibilities, but rather, was expected to function as a Group Leader in the production module to which he was assigned. Zierke counters by noting his production module already had two Group Leaders and submits an office memorandum on which his name does not appear among the other Group Leaders.

Clearly there is a factual dispute as to what Zierke's role was in the production module, whether he alone was denied computer training, and whether he was singled out when he was not provided a desk or telephone. The issue though, is whether the factual dispute concerns a material issue which could affect the outcome of a trial. By itself, these factual disputes would not preclude summary judgment unless the disparate treatment was linked to a discriminatory motive. [33] The alleged statements of Relick and Bryant are the type of "smoking guns" which provide such a link. Given the allegation of such a blatantly discriminatory statement, the Court views with a suspicious eye Donnelley's argument that Relick can not be considered a member of the decision making group. [34] Viewing the facts in a light most [*16] favorable to Zierke, it is certainly not inconceivable that a vice president with such an opinion could effect a desired result despite not partaking in the paired comparison process.

[*17] Furthermore, drawing reasonable inferences in Zierke's favor, Bryant's alleged statement and gesture

---

[29]   Plaintiff's 12(N) Exhibit A, Deposition of Scott Zierke, at 127, 129.

[30]   *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 667 (7th Cir. 1995).

[31]   *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring in judgment).

[32]   *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996).

[33]   This is because courts do not question personnel decisions which are merely unfair, only those motivated by unlawful considerations. *See, e.g., Sample v. Aldi, Inc.*, 61 F.3d 544, 551 (7th Cir. 1995); *Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir. 1994), *cert. denied*, *513 U.S. 948, 115 S. Ct. 359, 130 L. Ed. 2d 313 (1994)*.

[34]   *Compare* instant case where company vice president allegedly made the statement, *with, Finnegan v. Trans World Airlines, Inc.*, 767 F. Supp. 867, 876 (N.D.Ill. 1991), *aff'd by, Finnegan v. Trans World Airlines, Inc.*, 967 F.2d 1161 (7th Cir. 1992) (finding stray remark was not direct evidence of discrimination intent because there was no evidence TWA's president, who was ultimately final decision maker, made, heard or agreed with alleged discriminatory statement).

1997 U.S. Dist. LEXIS 12925, *17

supports Zierke's allegation. While Bryant himself may not have had any discriminatory view towards Zierke (as evidenced by the high rating Bryant gave him), Bryant was ostensibly privy to the views of other raters and of Relick. Bryant's comment was made in the context of discussing Zierke's status with Donnelley [35] and could be viewed as apprising Zierke of the obstacles he faced.

Both Relick's and Bryant's alleged statements can be interpreted as acknowledging a discriminatory intent, [36] [*19] and furthermore, directly relate to the decision making process. Whereas both statements allegedly were made when Zierke's and all Group Leader's job security was in limbo, the statements are temporally related to the decision [*18] making process. [37] Accordingly, the Court finds the alleged statements of Relick and Bryant qualify as direct evidence and bring the case under *Price Waterhouse* analysis. [38] Furthermore, we find such evidence presents a genuine issue of material fact as to whether Zierke's handicap was a factor in the decision making process.

*McDonnell Douglas.* Under the indirect method of proving discrimination, a plaintiff must initially prove a *prima facie* case by showing: (i) he is "disabled" as defined under the ADA; (ii) his work performance met the employer's legitimate expectations; (iii) he was treated adversely in the employment context; and (iv) non-protected employees were treated more favorably. [39] Once a plaintiff establishes a *prima facie* case, the burden then shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse treatment. [*20] [40] If this burden is in turn met by defendant, plaintiff must prove that defendant's stated reason is mere pretext masking a discriminatory action. [41]

Donnelley argues it terminated Zierke because his work performance rated as one of the bottom three Group Leaders under the paired comparison process, and thus, Zierke can not establish the second element of his *prima facie* case nor could he prove this stated reason was pretext. Donnelley also argues Zierke voluntarily opted for the severance package and therefore cannot make out a claim for constructive discharge. Each argument will be addressed in turn.

*In attempting to show his work performance met Donnelley's legitimate expectations*, Zierke points to his performance evaluations from 1989 to 1992 completed by his then supervisor Martha Ramirez ("Ramirez"). [42] Ramirez rated Zierke as an "excellent" Group Leader, recommended he receive a double pay increase, and rated him as "outstanding" [*21] in areas of job knowledge, skills ability and application, cooperation, judgment, initiative and resourcefulness, versatility and adaptability, dependability, attendance and punctuality, verbal and written

---

[35] *Compare, Greier, 99 F.3d at 242* (finding stray remark was not direct evidence because it was made in casual conversation in a setting unrelated to discussions of plaintiff's work deficiencies).

[36] With respect to Bryant's alleged statement, *Cf., Price Waterhouse*, 409 U.S. at 273 (O'Connor, J., concurring in judgment) (plaintiff was told by person privy to decision making process that gender was major reason for being denied partnership status). Regarding Relick's alleged statement, the fact that he claimed he *personally* was not biased or bothered by Zierke's disability is of no consequence. *See, e.g., Vande Zande v. State of Wis. Dept. of Admin., 44 F.3d 538, 541 (7th Cir. 1995)* ("'Disability' is broadly defined. It includes not only 'a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual,' but also the state of 'being regarded as having such an impairment.' . . . Many such impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence.") *See also, Soodman, 1997 U.S. Dist. LEXIS 1495, 1997 WL 106257 at 7* (finding plaintiff's testimony and letter submitted showing plaintiff was terminated because she was on medical leave was sufficient direct evidence to create genuine issue of material fact under *Price Waterhouse* to defeat motion for summary judgment).

[37] *Compare, Greier, 99 F.3d at 242* (finding stray remark not direct evidence where it was made in casual conversation a full year prior to plaintiff's discharge and did not relate to any discussion of plaintiff's work deficiencies).

[38] Even if Bryant's statement only amounts to circumstantial evidence, it nonetheless buttresses a *Price Waterhouse* analysis. *See, Finnegan, 767 F. Supp. at 875 n. 22* (once plaintiff presents direct evidence and thus brings case under *Price Waterhouse*, he may use circumstantial evidence as well).

[39] *DeLuca, 53 F.3d at 797.*

[40] *Id.*

[41] *Id.*

[42] Plaintiff's 12(N) Exhibit M.

1997 U.S. Dist. LEXIS 12925, *21

communication, housekeeping and safety, and overtime contribution. [43]

In July 1993, following the fire Donnelley suffered that May, Zierke received a Record of Achievement award for the "great personal sacrifice" he made to assist in Donnelley's recovery. [44]

By November 1993 however, Zierke was offered a severance package or the option to bump and compete for a lower position.

Generally such evidence of past favorable performance reviews are of little help since [*22] the relevant focus is on a plaintiff's performance at the time of discharge. [45] However, the lack of any negative remarks on Zierke's performance, the fact he received such high praise from Ramirez, and the special commendation given Zierke as recent as three months prior to his termination does more than merely raise a skeptical brow. Viewed in conjunction with Relick's and Bryant's alleged statements and Zierke's contention he was denied computer training given to other Group Leaders, we find a genuine issue of material fact is raised concerning whether Donnelley's proffered reason is pretext for a discriminatory motive.

*Furthermore, Zierke has a genuine issue of fact as to whether he was constructively discharged.* A constructive discharge occurs when an employer makes an employee's working conditions so intolerable that a reasonable employee [*23] would feel forced into an involuntary resignation. [46] An employee presented with the choice of accepting a demotion to a position formerly occupied, under the

supervision of former peers, with no opportunities for promotion can be the equivalent of a constructive discharge. [47]

Viewing the facts in a light most favorable to him, Zierke was faced with the prospect of decreased pay and little opportunity for advancement if he accepted the offer to bump and compete for the proofreading assignment. Believing, as he did, he was being singled out and denied opportunities because of his handicap, plaintiff accepted the "three-times" severance package offered to him. [48] [*24] Whether this constituted a constructive discharge is an issue best left for the trier of fact to decide. [49]

Accordingly, for the reasons stated and discussed, the Court recommends Defendant's *Motion for Summary Judgment* be **denied**.

Pursuant to *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties must file their objections to the Report and Recommendation with The Honorable Wayne R. Andersen within 10 days after being served with a copy of the order. Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's report. [50]

[*25] *So Recommended.*

Dated: August 26, 1997.

W. Thomas Rosemond, Jr.

United States Magistrate Judge

---

[43]  Plaintiff's 12(N) Exhibit M, Deposition of Martha Ramirez at 88-95.

[44]  Plaintiff's 12(N) Exhibit M at Ramirez deposition exhibit 8.

[45]  *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1262 (7th Cir. 1993), *cert. denied*, **511 U.S. 1005, 114 S. Ct. 1372, 128 L. Ed. 2d 48 (1994)**.

[46]  *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996).

[47]  *Farr v. Continental White Cap, Inc.*, 762 F. Supp. 814, 817 (N.D.Ill. 1991).

[48]  Zierke alleges that in fact, it was suggested to him that he take the "three times" severance package offered as opposed to "bumping-and-competing" for a proofreader's job with an uncertain future, given that a Proofreading Technician would be eligible to receive only a "one and one-half times" severance package if subsequently laid off. Plaintiff's 12(N) at PP21-23.

[49]  *Bernstein v. Consolidated Foods Corp.*, 622 F. Supp. 1096, 1101 (N.D.Ill. 1984).

[50]  *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538 (7th Cir. 1986). *See also*, *The Provident Bank v. Manor Steel Corporation*, 882 F.2d 258, 261 (7th Cir. 1989) (when a matter has been referred to a Magistrate Judge, acting as a special master or § 636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's report).